## YAKUS *v.* UNITED STATES.

NO. 374.

Argued January 7, 1944.—Decided March 27, 1944.

416

*Messrs. Joseph Kruger* and *Leonard Poretsky,* with whom *Mr. Harold Widetsky* was on the brief, for petitioner in No. 374. *Messrs. Leonard Poretsky* and *William H. Lewis,* with whom *Mr. John H. Backus* was on the brief, for petitioners in No. 375.

*Solicitor General Fahy,* with whom *Messrs. Paul A. Freund, Thomas I. Emerson,* and *David London* were on the brief, for the United States.

*Messrs. Maxwell C. Katz, Otto C. Sommerich,* and *Benjamin Busch* filed a brief, as *amici curiae,* in No. 375, urging reversal.

Opinion of the Court by Mr. Chief Justice Stone, announced by Mr. Justice Roberts.

The questions for our decision are: (1) Whether the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 50 U. S. C. App. Supp. II, §§ 901 *et seq.,* as amended by the Inflation Control Act of October 2, 1942, 56 Stat. 765, 50 U. S. C. App. Supp. II, §§ 961 *et seq.,* involves an unconstitutional delegation to the Price Administrator of the legislative power of Congress to control prices; (2) whether § 204 (d) of the Act was intended to preclude consideration by a district court of the validity of a maximum price regulation promulgated by the Administrator, as a defense to a criminal prosecution for its violation; (3) whether the exclusive statutory procedure set up by §§ 203 and 204 of the Act for administrative and judicial review of regulations, with the accompanying stay provisions, provide a sufficiently adequate means of determining the validity of a price regulation to meet the demands of due process; and (4) whether, in view of this available method of review, § 204 (d) of the Act, if construed to preclude consideration of the validity of the regulation as a defense to a prosecution for violating it, contravenes the Sixth Amendment, or works an unconstitutional legislative interference with the judicial power.

Petitioners in both of these cases were tried and convicted by the District Court for Massachusetts upon several counts of indictments charging violation of §§ 4 (a) and 205 (b) of the Act by the willful sale of wholesale cuts of beef at prices above the maximum prices prescribed by §§ 1364.451–1364.455 of Revised Maximum Price Regulation No. 169, 7 Fed. Reg. 10381 *et seq.* Petitioners have not availed themselves of the procedure set up by §§ 203 and 204 by which any person subject to a maximum price regulation may test its validity by protest to and hearing before the Administrator, whose determination may be

reviewed on complaint to the Emergency Court of Appeals and by this Court on certiorari, see *Lockerty* v. *Phillips*, 319 U. S. 182. When the indictments were found the 60 days' period allowed by the statute for filing protests had expired.

In the course of the trial the District Court overruled or denied offers of proof, motions and requests for rulings, raising various questions as to the validity of the Act and Regulation, including those presented by the petitions for certiorari. In particular petitioners offered evidence, which the District Court excluded as irrelevant, for the purpose of showing that the Regulation did not conform to the standards prescribed by the Act and that it deprived petitioners of property without the due process of law guaranteed by the Fifth Amendment. They specifically raised the question reserved in *Lockerty* v. *Phillips, supra,* whether the validity of a regulation may be challenged in defense of a prosecution for its violation although it had not been tested by the prescribed administrative procedure and complaint to the Emergency Court of Appeals. The District Court convicted petitioners upon verdicts of guilty. The Circuit Court of Appeals for the First Circuit affirmed, 137 F. 2d 850, and we granted certiorari, 320 U. S. 730.

## I.

The Emergency Price Control Act provides for the establishment of the Office of Price Administration under the direction of a Price Administrator appointed by the President, and sets up a comprehensive scheme for the promulgation by the Administrator of regulations or orders fixing such maximum prices of commodities and rents as will effectuate the purposes of the Act and conform to the standards which it prescribes. The Act was adopted as a temporary wartime measure, and provides in § 1 (b) for its termination on June 30, 1943, unless sooner

terminated by Presidential proclamation or concurrent resolution of Congress. By the amendatory Act of October 2, 1942, it was extended to June 30, 1944.

Section 1 (a) declares that the Act is "in the interest of the national defense and security and necessary to the effective prosecution of the present war," and that its purposes are:

"to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, . . . and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; . . ."

The standards which are to guide the Administrator's exercise of his authority to fix prices, so far as now relevant, are prescribed by § 2 (a) and by § 1 of the amendatory Act of October 2, 1942, and Executive Order 9250, promulgated under it. 7 Fed. Reg. 7871. By § 2 (a) the Administrator is authorized, after consultation with representative members of the industry so far as practicable, to promulgate regulations fixing prices of commodities which "in his judgment will be generally fair and equitable and will effectuate the purposes of this Act" when, in his judgment, their prices "have risen or threaten to rise to an extent or in a manner inconsistent with the purposes of this Act."

The section also directs that

"So far as practicable, in establishing any maximum price, the Administrator shall ascertain and give due consideration to the prices prevailing between October 1 and October 15, 1941 (or if, in the case of any commodity, there are no prevailing prices between such dates, or the prevailing prices between such dates are not generally representative because of abnormal or seasonal market conditions or other cause, then to the prices prevailing during the nearest two-week period in which, in the judgment of the Administrator, the prices for such commodity are generally representative) . . . and shall make adjustments for such relevant factors as he may determine and deem to be of general applicability, including . . . Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity or commodities, during and subsequent to the year ended October 1, 1941."

By the Act of October 2, 1942, the President is directed to stabilize prices, wages and salaries "so far as practicable" on the basis of the levels which existed on September 15, 1942, except as otherwise provided in the Act. By Title I, § 4 of Executive Order No. 9250, he has directed "all departments and agencies of the Government" "to stabilize the cost of living in accordance with the Act of October 2, 1942." [1]

Revised Maximum Price Regulation No. 169 was issued December 10, 1942, under authority of the Emergency Price Control Act as amended and Executive Order No. 9250. The Regulation established specific maximum

---

[1] The parties have not discussed in briefs or on argument, and we do not find it necessary to consider, the precise effect of this direction to stabilize prices "so far as practicable" at the levels obtaining on September 15, 1942, upon the standards laid down by § 2 (a) of the Act and the discretion which they confer on the Administrator.

prices for the sale at wholesale of specified cuts of beef and veal. As is required by § 2 (a) of the Act, it was accompanied by a "statement of the considerations involved" in prescribing it. From the preamble to the Regulation and from the Statement of Considerations accompanying it, it appears that the prices fixed for sales at wholesale were slightly in excess of those prevailing between March 16 and March 28, 1942,[2] and approximated those prevailing on September 15, 1942. Findings that the Regulation was necessary, that the prices which it fixed were fair and equitable, and that it otherwise conformed to the standards prescribed by the Act, appear in the Statement of Considerations.

That Congress has constitutional authority to prescribe commodity prices as a war emergency measure, and that the Act was adopted by Congress in the exercise of that power, are not questioned here, and need not now be considered save as they have a bearing on the procedural

---

[2] The use of the March 16–28, 1942, base period is explained by the fact that wholesale meat prices had already been stabilized at approximately that level by Maximum Price Regulation No. 169 as originally issued on June 19, 1942, 7 Fed. Reg. 4653, and by the General Maximum Price Regulation, issued April 28, 1942, 7 Fed. Reg. 3153, which forbade the sale of most commodities at prices in excess of the highest price charged by the seller during March, 1942. The Statement of Considerations accompanying the latter, 2 C. C. H. War Law Service—Price Control, ¶ 42,081, explains in some detail the considerations impelling the Administrator to the conclusion that stabilization at the levels obtaining in March, 1942 would be fair and equitable and would effectuate the purposes of the Act; it considers the price levels prevailing during October 1–15, 1941, and gives reasons why price stabilization at those levels would not be practicable. The Statement of Considerations accompanying Maximum Price Regulation No. 169 as originally issued, 2 C. C. H. War Law Service—Price Control, ¶ 43,369A, refers to this discussion in explanation of the continuance of the use of March, 1942, levels as a base.

features of the Act later to be considered which are challenged on constitutional grounds.

Congress enacted the Emergency Price Control Act in pursuance of a defined policy and required that the prices fixed by the Administrator should further that policy and conform to standards prescribed by the Act. The boundaries of the field of the Administrator's permissible action are marked by the statute. It directs that the prices fixed shall effectuate the declared policy of the Act to stabilize commodity prices so as to prevent wartime inflation and its enumerated disruptive causes and effects. In addition the prices established must be fair and equitable, and in fixing them the Administrator is directed to give due consideration, so far as practicable, to prevailing prices during the designated base period, with prescribed administrative adjustments to compensate for enumerated disturbing factors affecting prices. In short the purposes of the Act specified in § 1 denote the objective to be sought by the Administrator in fixing prices—the prevention of inflation and its enumerated consequences. The standards set out in § 2 define the boundaries within which prices having that purpose must be fixed. It is enough to satisfy the statutory requirements that the Administrator finds that the prices fixed will tend to achieve that objective and will conform to those standards, and that the courts in an appropriate proceeding can see that substantial basis for those findings is not wanting.

The Act is thus an exercise by Congress of its legislative power. In it Congress has stated the legislative objective, has prescribed the method of achieving that objective— maximum price fixing—, and has laid down standards to guide the administrative determination of both the occasions for the exercise of the price-fixing power, and the particular prices to be established. Compare *Field* v. *Clark*, 143 U. S. 649; *Hampton & Co.* v. *United States*, 276

U. S. 394; *Currin* v. *Wallace,* 306 U. S. 1; *Mulford* v. *Smith,* 307 U. S. 38; *United States* v. *Rock Royal Co-op.,* 307 U. S. 533; *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126; *National Broadcasting Co.* v. *United States,* 319 U. S. 190; *Hirabayashi* v. *United States,* 320 U. S. 81.

The Act is unlike the National Industrial Recovery Act of June 16, 1933, 48 Stat. 195, considered in *Schechter Corp.* v. *United States,* 295 U. S. 495, which proclaimed in the broadest terms its purpose "to rehabilitate industry and to conserve natural resources." It prescribed no method of attaining that end save by the establishment of codes of fair competition, the nature of whose permissible provisions was left undefined. It provided no standards to which those codes were to conform. The function of formulating the codes was delegated, not to a public official responsible to Congress or the Executive, but to private individuals engaged in the industries to be regulated. Compare *Sunshine Coal Co.* v. *Adkins, supra,* 399.

The Constitution as a continuously operative charter of government does not demand the impossible or the impracticable. It does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct—here the rule, with penal sanctions, that prices shall not be greater than those fixed by maximum price regulations which conform to standards and will tend to further the policy which Congress has established. These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence,

ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework. See *Opp Cotton Mills* v. *Administrator, supra,* 145–6, and cases cited.

Nor does the doctrine of separation of powers deny to Congress power to direct that an administrative officer properly designated for that purpose have ample latitude within which he is to ascertain the conditions which Congress has made prerequisite to the operation of its legislative command. Acting within its constitutional power to fix prices it is for Congress to say whether the data on the basis of which prices are to be fixed are to be confined within a narrow or a broad range. In either case the only concern of courts is to ascertain whether the will of Congress has been obeyed. This depends not upon the breadth of the definition of the facts or conditions which the administrative officer is to find but upon the determination whether the definition sufficiently marks the field within which the Administrator is to act so that it may be known whether he has kept within it in compliance with the legislative will.

As we have said, "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality . . . to perform its function." *Currin* v. *Wallace, supra,* 15. Hence it is irrelevant that Congress might itself have prescribed the maximum prices or have provided a more rigid standard by which they are to be fixed; for example, that all prices should be frozen at the levels obtaining during a certain period or on a certain date. See *Union Bridge Co.* v. *United States,* 204 U. S. 364, 386. Congress is not confined

to that method of executing its policy which involves the least possible delegation of discretion to administrative officers. Compare *M'Culloch* v. *Maryland,* 4 Wheat. 316, 413 *et seq.* It is free to avoid the rigidity of such a system, which might well result in serious hardship, and to choose instead the flexibility attainable by the use of less restrictive standards. Cf. *Hampton & Co.* v. *United States, supra,* 408, 409. Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose of preventing inflation.

The standards prescribed by the present Act, with the aid of the "statement of considerations" required to be made by the Administrator, are sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the Administrator, in fixing the designated prices, has conformed to those standards. Compare *Hirabayashi* v. *United States, supra,* 104. Hence we are unable to find in them an unauthorized delegation of legislative power. The authority to fix prices only when prices have risen or threaten to rise to an extent or in a manner inconsistent with the purpose of the Act to prevent inflation is no broader than the authority to fix maximum prices when deemed necessary to protect consumers against unreasonably high prices, sustained in *Sunshine Anthracite Coal Co.* v. *Adkins, supra,* or the authority to take possession of and operate telegraph lines whenever deemed necessary for the national security or defense, upheld in *Dakota Central Tel. Co.* v. *South Dakota,* 250 U. S. 163; or the authority to suspend tariff provisions upon findings that the duties imposed by a foreign state are "reciprocally unequal and unreasonable," held valid in *Field* v. *Clark, supra.*

The directions that the prices fixed shall be fair and equitable, that in addition they shall tend to promote the purposes of the Act, and that in promulgating them consideration shall be given to prices prevailing in a stated base period, confer no greater reach for administrative determination than the power to fix just and reasonable rates, see *Sunshine Coal Co.* v. *Adkins, supra,* and cases cited; or the power to approve consolidations in the "public interest," sustained in *New York Central Securities Corp.* v. *United States,* 287 U. S. 12, 24–5 (compare *United States* v. *Lowden,* 308 U. S. 225); or the power to regulate radio stations engaged in chain broadcasting "as public interest, convenience or necessity requires," upheld in *National Broadcasting Co.* v. *United States, supra,* 225–6; or the power to prohibit "unfair methods of competition" not defined or forbidden by the common law, *Federal Trade Commission* v. *Keppel & Bro.,* 291 U. S. 304; or the direction that in alloting marketing quotas among states and producers due consideration be given to a variety of economic factors, sustained in *Mulford* v. *Smith, supra,* 48–9; or the similar direction that in adjusting tariffs to meet differences in costs of production the President "take into consideration" "in so far as he finds it practicable" a variety of economic matters, sustained in *Hampton & Co.* v. *United States, supra;* or the similar authority, in making classifications within an industry, to consider various named and unnamed "relevant factors" and determine the respective weights attributable to each, held valid in *Opp Cotton Mills* v. *Administrator, supra.*

## II.

We consider next the question whether the procedure which Congress has established for determining the validity of the Administrator's regulations is exclusive so as to preclude the defense of invalidity of the Regulation in this criminal prosecution for its violation under §§ 4 (a) and

205 (b). Section 203 (a) sets up a procedure by which "any person subject to any provision of a regulation or order" may within sixty days after it is issued "file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections." He may similarly protest later, on grounds arising after the expiration of the original sixty days. The subsection directs that within a reasonable time and in no event more than thirty days after the filing of a protest or ninety days after the issue of the regulation protested, whichever is later, "the Administrator shall either grant or deny such protest in whole or in part, notice such protest for hearing, or provide an opportunity to present further evidence in connection therewith. In the event that the Administrator denies any such protest in whole or in part, he shall inform the protestant of the grounds upon which such decision is based, and of any economic data and other facts of which the Administrator has taken official notice."

Section 204 (c) creates a court to be known as the Emergency Court of Appeals consisting of United States district or circuit judges designated by the Chief Justice of the United States. Section 204 (a) authorizes any person aggrieved by the denial or partial denial of his protest to file a complaint with the Emergency Court of Appeals within thirty days after the denial, praying that the regulation, order or price schedule protested be enjoined or set aside in whole or in part. The court may issue such an injunction only if it finds that the regulation, order or price schedule "is not in accordance with law, or is arbitrary or capricious." (Subsection (b).) It is denied power to issue a temporary restraining order or interlocutory decree. (Subsection (c).) The effectiveness of any permanent injunction it may issue is postponed for thirty days, and if review by this Court is sought upon writ of certiorari, as authorized by subsection (d), its effectiveness is further

postponed until final disposition of the case by this Court by denial of certiorari or decision upon the merits. (Subsection (b).)

Section 204 (d) declares:

"The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision."

In *Lockerty* v. *Phillips, supra,* we held that these provisions conferred on the Emergency Court of Appeals, subject to review by this Court, exclusive equity jurisdiction to restrain enforcement of price regulations of the Administrator and that they withdrew such jurisdiction from all other courts. This was accomplished by the exercise of the constitutional power of Congress to prescribe the jurisdiction of inferior federal courts, and the jurisdiction of all state courts to determine federal questions, and to vest that jurisdiction in a single court, the Emergency Court of Appeals.

The considerations which led us to that conclusion with respect to the equity jurisdiction of the district court, lead to the like conclusion as to its power to consider the validity of a price regulation as a defense to a criminal prosecution for its violation. The provisions of § 204 (d), con-

ferring upon the Emergency Court of Appeals and this Court "exclusive jurisdiction to determine the validity of any regulation or order," coupled with the provision that "no court, Federal, State or Territorial, shall have jurisdiction or power to consider the validity of any such regulation," are broad enough in terms to deprive the district court of power to consider the validity of the Administrator's regulation or order as a defense to a criminal prosecution for its violation.

That such was the intention of Congress appears from the report of the Senate Committee on Banking and Currency, recommending the adoption of the bill which contained the provisions of § 204 (d). After pointing out that the bill provided for exclusive jurisdiction of the Emergency Court and the Supreme Court to determine the validity of regulations or orders issued under § 2, the Committee said: "The courts in which criminal or civil enforcement proceedings are brought have jurisdiction, concurrently with the Emergency Court, to determine the constitutional validity of the statute itself." Sen. Rep. 931, 77th Cong., 2d Sess., p. 25. That the Committee, in making this statement, intended to distinguish between the validity of the statute and that of a regulation, and to permit consideration only of the former in defense to a criminal prosecution, is further borne out by the fact that the bill as introduced in the House had provided that the Emergency Court of Appeals should have exclusive jurisdiction to determine the validity of the provisions of the Act authorizing price regulations, as well as of the regulations themselves. H. R. 5479, 77th Cong., 1st Sess., printed in Hearings before Committee on Banking and Currency, House of Representatives, 77th Cong., 2d Sess., on H. R. 5479, pp. 4, 7–8.

Congress, in thus authorizing consideration by the district court of the validity of the Act alone, gave clear indication that the validity of the Administrator's regula-

tions or orders should not be subject to attack in criminal prosecutions for their violation, at least before their invalidity had been adjudicated by recourse to the protest procedure prescribed by the statute. Such we conclude is the correct construction of the Act.

## III.

We come to the question whether the provisions of the Act, so construed as to deprive petitioners of opportunity to attack the Regulation in a prosecution for its violation, deprive them of the due process of law guaranteed by the Fifth Amendment. At the trial, petitioners offered to prove that the Regulation would compel them to sell beef at such prices as would render it impossible for wholesalers such as they are, no matter how efficient, to conduct their business other than at a loss. Section 4 (d) declares that "Nothing in this Act shall be construed to require any person to sell any commodity . . ." Petitioners were therefore not required by the Act, nor so far as appears by any other rule of law, to continue selling meat at wholesale if they could not do so without loss. But they argue that to impose on them the choice either of refraining from sales of beef at wholesale or of running the risk of numerous criminal prosecutions and suits for treble damages authorized by § 205 (e), without the benefit of any temporary injunction or stay pending determination by the prescribed statutory procedure of the Regulation's validity, is so harsh in its application to them as to deny them due process of law. In addition they urge the inadequacy of the administrative procedure and particularly of the sixty days' period afforded by the Act within which to prepare and lodge a protest with the Administrator.

In considering these asserted hardships, it is appropriate to take into account the purposes of the Act and the circumstances attending its enactment and application as a wartime emergency measure. The Act was adopted Jan-

uary 30, 1942, shortly after our declaration of war against Germany and Japan, when it was common knowledge, as is emphasized by the legislative history of the Act, that there was grave danger of wartime inflation and the disorganization of our economy from excessive price rises. Congress was under pressing necessity of meeting this danger by a practicable and expeditious means which would operate with such promptness, regularity and consistency as would minimize the sudden development of commodity price disparities, accentuated by commodity shortages occasioned by the war.

Inflation is accelerated and its consequences aggravated by price disparities not based on geographic or other relevant differentials. The harm resulting from delayed or unequal price control is beyond repair. And one of the problems involved in the prevention of inflation by establishment of a nation-wide system of price control is the disorganization which would result if enforcement of price orders were delayed or sporadic or were unequal or conflicting in different parts of the country. These evils might well arise if regulations with respect to which there was full opportunity for administrative revision were to be made ineffective by injunction or stay of their enforcement in advance of such revision or of final determination of their validity.

Congress, in enacting the Emergency Price Control Act, was familiar with the consistent history of delay in utility rate cases. It had in mind the dangers to price control as a preventive of inflation if the validity and effectiveness of prescribed maximum prices were to be subject to the exigencies and delays of litigation originating in eighty-five district courts and continued by separate appeals through eleven separate courts of appeals to this Court, to say nothing of litigation conducted in state courts. See Sen. Rep. No. 931, 77th Cong., 2d Sess., pp. 23–5.

Congress sought to avoid or minimize these difficulties by the establishment of a single procedure for review of the Administrator's regulations, beginning with an appeal to the Administrator's specialized knowledge and experience gained in the administration of the Act, and affording to him an opportunity to modify the regulations and orders complained of before resort to judicial determination of their validity. The organization of such an exclusive procedure especially adapted to the exigencies and requirements of a nation-wide scheme of price regulation is, as we have seen, within the constitutional power of Congress to create inferior federal courts and prescribe their jurisdiction. The considerations which led to its creation are similar to, and certainly no weaker than, those which led this Court in *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, and the long line of cases following it, to require resort to the Interstate Commerce Commission and the special statutory method provided for review of its decisions in certain types of cases involving railway rates. As with the present statute, it was thought desirable to preface all judicial action by resort to expert administrative knowledge and experience, and thus minimize the confusion that would result from inconsistent decisions of district and circuit courts rendered without the aid of an administrative interpretation. In addition the present Act seeks further to avoid that confusion by restricting judicial review of the administrative determination to a single court. Such a procedure, so long as it affords to those affected a reasonable opportunity to be heard and present evidence, does not offend against due process. *Bradley* v. *Richmond,* 227 U. S. 477; *First National Bank* v. *Weld County,* 264 U. S. 450; *Anniston Mfg. Co.* v. *Davis,* 301 U. S. 337.

Petitioners assert that they have been denied that opportunity because the sixty days' period allowed for filling a protest is insufficient for that purpose; because the pro-

cedure before the Administrator is inadequate to ensure due process; because the statute precludes any interlocutory injunction staying enforcement of a price regulation before final adjudication of its validity; because the trial of the issue of validity of a regulation is excluded from the criminal trial for its violation; and because in any case there is nothing in the statute to prevent their conviction for violation of a regulation before they could secure a ruling on its validity. A sufficient answer to all these contentions is that petitioners have failed to seek the administrative remedy and the statutory review which were open to them and that they have not shown that had they done so any of the consequences which they apprehend would have ensued to any extent whatever, or if they should, that the statute withholds judicial remedies adequate to protect petitioners' rights.

For the purposes of this case, in passing upon the sufficiency of the procedure on protest to the Administrator and complaint to the Emergency Court, it is irrelevant to suggest that the Administrator or the Court has in the past or may in the future deny due process. Action taken by them is reviewable in this Court and if contrary to due process will be corrected here. Hence we have no occasion to pass upon determinations of the Administrator or the Emergency Court, said to violate due process, which have never been brought here for review, and obviously we cannot pass upon action which might have been taken on a protest by petitioners, who have never made a protest or in any way sought the remedy Congress has provided. In the absence of any proceeding before the Administrator we cannot assume that he would fail in the performance of any duty imposed on him by the Constitution and laws of the United States, or that he would deny due process to petitioners by "loading the record against them" or denying such hearing as the Constitution prescribes. *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531, 545; *Hall*

v. *Geiger-Jones Co.,* 242 U. S. 539, 554; *Minnesota* v. *Probate Court,* 309 U. S. 270, 277, and cases cited.   Only if we could say in advance of resort to the statutory procedure that it is incapable of affording due process to petitioners could we conclude that they have shown any legal excuse for their failure to resort to it or that their constitutional rights have been or will be infringed.   *Natural Gas Co.* v. *Slattery,* 302 U. S. 300, 309; *Anniston Mfg. Co.* v. *Davis, supra,* 356–7; *Minnesota* v. *Probate Court, supra,* 275, 277. But upon a full examination of the provisions of the statute it is evident that the authorized procedure is not incapable of affording the protection to petitioners' rights required by due process.

The regulations, which are given the force of law, are published in the Federal Register, and constructive notice of their contents is thus given all persons affected by them. 44 U. S. C. § 307.   The penal provisions of the statute are applicable only to violations of a regulation which are willful.   Petitioners have not contended that they were unaware of the Regulation and the jury found that they knowingly violated it within eight days after its issue.

The sixty days' period allowed for protest of the Administrator's regulations cannot be said to be unreasonably short in view of the urgency and exigencies of wartime price regulation.[3]   Here the Administrator is required to act initially upon the protest within thirty days after it is filed or ninety days after promulgation of the challenged regulation, by allowing the protest wholly or in part, or denying it or setting it down for hearing.   (§ 203 (a).)

---

[3] For numerous instances in which comparable or shorter periods for resort to administrative relief as a prerequisite to proceeding in the courts have been held to be sufficient, see, e. g., *Bellingham Bay & B. C. R. Co.* v. *New Whatcom,* 172 U. S. 314 (10 days); *Campbell* v. *Olney,* 262 U. S. 352 (20 days); *Wick* v. *Chelan Electric Co.,* 280 U. S. 108 (18 days); *Phillips* v. *Commissioner,* 283 U. S. 589 (60 days); *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126 (40 days).

But we cannot say that the Administrator would not have allowed ample time for the presentation of evidence.[4] And under § 204 (a) petitioners could have applied to the Emergency Court of Appeals for leave to introduce any additional evidence "which could not reasonably" have been offered to the Administrator or included in the proceedings before him, and could have applied to the Administrator to modify or change his decision in the light of that evidence.

Nor can we say that the administrative hearing provided by the statute will prove inadequate. We hold in *Bowles* v. *Willingham, post,* p. 503, that in the circumstances to which this Act was intended to apply, the failure to afford a hearing prior to the issue of a price regulation does not offend against due process. While the hearing on a protest may be restricted to the presentation of documentary evidence, affidavits and briefs, the Act contemplates, and the Administrator's regulations provide for, a full oral hearing upon a showing that written evidence and briefs "will not permit the fair and expeditious disposition of the protest." (§ 203 (a); Revised Procedural Regulation No. 1, § 1300.39, 7 Fed. Reg. 8961.) In advance of application to the Administrator for such a hearing we cannot well say whether its denial in any particular case would be a denial of due process. The Act requires the Administrator to inform the protestant of the grounds for his decision denying a protest, including all matters of which he has taken official notice. (§ 203 (a).) In view of the provisions for the introduction of further evidence both before and after the Administrator has announced his determination, we cannot say that if petitioners had filed a protest ade-

---

[4] Revised Procedural Regulation No. 1, 7 Fed. Reg. 8961, authorized by § 203 (a), contains detailed provisions for extending the time for presentation of evidence when appropriate. §§ 1300.30 (c), 1300.33, 1300.35 (a) (3).

quate opportunity would not have been afforded them to meet any arguments and evidence put forward by the Administrator, or that if such opportunity had been denied the denial would not have been corrected by the Emergency Court.

The Emergency Court has power to review all questions of law, including the question whether the Administrator's determination is supported by evidence, and any question of the denial of due process or any procedural error appropriately raised in the course of the proceedings. No reason is advanced why petitioners could not, throughout the statutory proceeding, raise and preserve any due process objection to the statute, the regulations, or the procedure, and secure its full judicial review by the Emergency Court of Appeals and this Court. Compare *White* v. *Johnson*, 282 U. S. 367, 374.[5]

In the circumstances of this case we find no denial of due process in the statutory prohibition of a temporary stay or injunction. The present statute is not open to the objection that petitioners are compelled to serve the public as in the case of a public utility, or that the only method by which they can test the validity of the regula-

---

[5] Nor is the inconvenience to petitioners of being required to make their objection to the Administrator in Washington, D. C. sufficient to outweigh the public interest, in the circumstances of this case, in having a centralized, unitary scheme of review of the regulations. The protest procedure is designed to be conducted primarily upon documentary evidence, § 203 (a); Revised Procedural Regulation No. 1, §§ 1300.29–1300.31, 1300.39. There would thus be no purpose in the personal presence of the protestant unless the protest were set for hearing by the Administrator, and in such a case the hearing may be held at any place designated by the Administrator and before a person designated by him. *Id.*, §§ 1300.39, 1300.42. The Emergency Court of Appeals is likewise authorized to "hold sessions at such places as it may specify" and does in fact hold sessions throughout the country as needed. § 204 (c): Rule 4 (a) of its Rules of Procedure, 50 U. S. C. App. Supp. II following § 924.

tions promulgated under it is by violating the statute and thus subjecting themselves to the possible imposition of severe and cumulative penalties. See *Ex parte Young*, 209 U. S. 123; *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 53–4; *Missouri Pacific Ry. Co.* v. *Tucker*, 230 U. S. 340; *Oklahoma Operating Co.* v. *Love*, 252 U. S. 331. For as we have seen, § 4 (d) specifically provides that no one shall be compelled to sell any commodity, and the statute itself provides an expeditious means of testing the validity of any price regulation, without necessarily incurring any of the penalties of the Act. Compare *Wadley Southern Ry. Co.* v. *Georgia*, 235 U. S. 651, 667–9.

The petitioners are not confronted with the choice of abandoning their businesses or subjecting themselves to the penalties of the Act before they have sought and secured a determination of the Regulation's validity. It is true that if the Administrator denies a protest no stay or injunction may become effective before the final decision of the Emergency Court or of this Court if review here is sought. It is also true that the process of reaching a final decision may be time-consuming. But while courts have no power to suspend or ameliorate the operation of a regulation during the pendency of proceedings to determine its validity, we cannot say that the Administrator has no such power or assume that he would not exercise it in an appropriate case.

The Administrator, who is the author of the regulations, is given wide discretion as to the time and conditions of their issue and continued effect. Section 2 (a) authorizes him to issue such regulations as will effectuate the purposes of the Act, whenever, in his judgment, such action is necessary. Section 201 (d) similarly authorizes him "from time to time" to issue regulations when necessary and proper to effectuate the purposes of the Act. One of the objects of the protest provisions is to enable the Administrator more fully to inform himself as to the wisdom

of a regulation through evidence of its effect on particular cases. In the light of that information he is authorized by § 203 (a) to grant or deny a protest "in whole or in part." And § 204 (a) authorizes the Administrator to modify or rescind a regulation "at any time." [6] Moreover § 2 (a) further authorizes the issue, in the Administrator's judgment, of temporary regulations, effective for sixty days, "establishing as a maximum . . . the price . . . prevailing with respect to any commodity . . . within five days prior to the date of issuance of such temporary regulations. . . ."

Under these sections the Administrator may not only alter or set aside the regulation, but he has wide scope for the exercise of his discretionary power to modify or suspend a regulation pending its administrative and judicial review. Hence we cannot assume that petitioners, had they applied to the Administrator, would not have secured all the relief to which they were entitled. The denial of a right to a restraining order or interlocutory injunction to one who has failed to apply for available administrative relief, not shown to be inadequate, is not a denial of due process. *Natural Gas Co.* v. *Slattery, supra,* 310.

In any event, we are unable to say that the denial of interlocutory relief pending a judicial determination of the validity of the regulation would, in the special circumstances of this case, involve a denial of constitutional right. If the alternatives, as Congress could have concluded, were wartime inflation or the imposition on individuals of the burden of complying with a price regulation while its validity is being determined, Congress could constitutionally make the choice in favor of the protection of the public interest from the dangers of inflation. Compare

---

[6] Revised Procedural Regulation No. 1 authorizes the filing at any time of a petition to amend a regulation (§ 1300.20), and authorizes the Administrator to treat a protest as a petition for amendment as well (§ 1300.49).

*Miller* v. *Schoene,* 276 U. S. 272, in which we held that the Fourteenth Amendment did not preclude a state from compelling the uncompensated destruction of private property in order to preserve important public interests from destruction.

The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. Compare *Scripps-Howard Radio* v. *Federal Communications Comm'n,* 316 U. S. 4, 10 and cases cited. Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction. *Meccano, Ltd.* v. *John Wanamaker,* 253 U. S. 136, 141; *Rice & Adams Corp.* v. *Lathrop,* 278 U. S. 509, 514. And it will avoid such inconvenience and injury so far as may be, by attaching conditions to the award, such as the requirement of an injunction bond conditioned upon payment of any damage caused by the injunction if the plaintiff's contentions are not sustained. *Prendergast* v. *New York Telephone Co.,* 262 U. S. 43, 51; *Ohio Oil Co.* v. *Conway,* 279 U. S. 813, 815.

But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.[7] *Virginian*

---

[7] Congress has sought to minimize the burden so far as would be consistent with the public interest by providing expeditious procedure for the review, on protest and complaint, of a regulation's validity. Thus a protest must be filed within 60 days (§ 203 (a)); the Administrator must take initial action on it within a reasonable time but not more than 30 days after its filing or 90 days after the issuance of the

*Ry. Co.* v. *United States,* 272 U. S. 658, 672–3; *Petroleum Exploration Co.* v. *Public Service Comm'n,* 304 U. S. 209, 222–3; *Dryfoos* v. *Edwards,* 284 F. 596, 603, affirmed, 251 U. S. 146; see *Beaumont, S. L. & W. Ry. Co.* v. *United States,* 282 U. S. 74, 91, 92. Compare *Wisconsin* v. *Illinois,* 278 U. S. 367, 418–21. This is but another application of the principle, declared in *Virginian Ry. Co.* v. *System Federation,* 300 U. S. 515, 552, that "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

Here, in the exercise of the power to protect the national economy from the disruptive influences of inflation in time of war Congress has seen fit to postpone injunctions restraining the operations of price regulations until their lawfulness could be ascertained by an appropriate and expeditious procedure. In so doing it has done only what a court of equity could have done, in the exercise of its discretion to protect the public interest. What the courts

---

regulation (§ 203 (a)); the complaint to the Emergency Court must be filed within 30 days (§ 204 (a)); that Court is directed to "prescribe rules governing its procedure in such manner as to expedite the determination of cases of which it has jurisdiction" (§ 204 (c)); in order to promote that end, as many judges as are needed may be designated to serve on it, it may sit in divisions, and may hold sessions at such places as it may specify (§ 204 (c)), and in fact it does sit in various parts of the country as the convenience of the parties may require; under its rules it is "always . . . open for the transaction of business," (Rule 4 (a); 50 U. S. C. App., Supp. II following § 924); petitions for certiorari to review its decisions must be filed within 30 days (§ 204 (d)); and this Court is directed to advance on the docket and expedite the decision of all cases from the Emergency Court (§ 204 (d)). We cannot assume that the Administrator, who has a vital interest in the prompt and effective enforcement of the Act, would unreasonably delay action upon a protest; if he should, judicial remedies are not lacking, see *Safeway Stores* v. *Brown,* 138 F. 2d 278, 280.

could do Congress can do as the guardian of the public interest of the nation in time of war. The legislative formulation of what would otherwise be a rule of judicial discretion is not a denial of due process or a usurpation of judicial functions. Cf. *Demorest* v. *City Bank Co.*, 321 U. S. 36.[8]

Our decisions leave no doubt that when justified by compelling public interest the legislature may authorize summary action subject to later judicial review of its validity. It may insist on the immediate collection of taxes. *Phillips* v. *Commissioner*, 283 U. S. 589, 595–7 and cases cited. It may take possession of property presumptively abandoned by its owner, prior to determination of

---

[8] For other instances in which Congress has regulated and restricted the power of the federal courts to grant injunctions, see: 1. Section 16 of the Judiciary Act of 1789, 1 Stat. 82, Judicial Code § 267, 28 U. S. C. § 384, denying relief in equity where there is adequate remedy at law. 2. Section 5 of the Act of March 2, 1793, 1 Stat. 334, Judicial Code § 265, 28 U. S. C. § 379, prohibiting injunction of state judicial proceedings. 3. Act of March 2, 1867, 14 Stat. 475, 26 U. S. C. § 3653, prohibiting suits to enjoin collection or enforcement of federal taxes. 4. The Johnson Act of May 14, 1934, 48 Stat. 775, 28 U. S. C. § 41 (1), restricting jurisdiction to enjoin orders of state bodies fixing utility rates. 5. Act of Aug. 21, 1937, 50 Stat. 738, 28 U. S. C. § 41 (1), similarly restricting jurisdiction to enjoin collection or enforcement of state taxes. 6. Section 17 of the Act of June 18, 1910, 36 Stat. 557 and § 3 of the Act of Aug. 24, 1937, 50 Stat. 752, 28 U. S. C. §§ 380 and 380 (a), requiring the convening of a three-judge court for the granting of temporary injunctions in certain cases and allowing a temporary restraining order by one judge only to prevent irreparable injury. 7. The Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. §§ 101–15, regulating the issue of injunctions in labor disputes and prohibiting their issue "contrary to the public policy" declared in the Act. In several cases such statutes were held to be merely declaratory of a previously obtaining rule for the guidance of judicial discretion. See, e. g., *State Railroad Tax Cases*, 92 U. S. 575, 613 (Act of March 2, 1867); *Matthews* v. *Rodgers*, 284 U. S. 521, 525 (Judicial Code § 267); *Great Lakes Dredge & Dock Co.* v. *Huffman*, 319 U. S. 293, 297 (Act of Aug. 21, 1937).

its actual abandonment. *Anderson National Bank* v. *Luckett,* 321 U. S. 233. For the protection of public health it may order the summary destruction of property without prior notice or hearing. *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306; *Adams* v. *Milwaukee,* 228 U. S. 572, 584. It may summarily requisition property immediately needed for the prosecution of the war. Compare *United States* v. *Pfitsch,* 256 U. S. 547. As a measure of public protection the property of alien enemies may be seized, and property believed to be owned by enemies taken without prior determination of its true ownership. *Central Union Trust Co.* v. *Garvan,* 254 U. S. 554, 566; *Stoehr* v. *Wallace,* 255 U. S. 239, 245. Similarly public necessity in time of war may justify allowing tenants to remain in possession against the will of the landlord. *Block* v. *Hirsh,* 256 U. S. 135; *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170. Even the personal liberty of the citizen may be temporarily restrained as a measure of public safety. *Hirabayashi* v. *United States, supra;* cf. *Jacobson* v. *Massachusetts,* 197 U. S. 11. Measured by these standards we find no denial of due process under the circumstances in which this Act was adopted and must be applied, in its denial of any judicial stay pending determination of a regulation's validity.

## IV.

As we have seen, Congress, through its power to define the jurisdiction of inferior federal courts and to create such courts for the exercise of the judicial power, could, subject to other constitutional limitations, create the Emergency Court of Appeals, give to it exclusive equity jurisdiction to determine the validity of price regulations prescribed by the Administrator, and foreclose any further or other consideration of the validity of a regulation as a defense to a prosecution for its violation.

Unlike most penal statutes and regulations whose validity can be determined only by running the risk of violation, see *Douglas* v. *City of Jeannette,* 319 U. S. 157, 163, the present statute provides a mode of testing the validity of a regulation by an independent administrative proceeding. There is no constitutional requirement that that test be made in one tribunal rather than in another, so long as there is an opportunity to be heard and for judicial review which satisfies the demands of due process, as is the case here. This was recognized in *Bradley* v. *Richmond, supra,* and in *Wadley Southern Ry. Co.* v. *Georgia, supra,* 667, 669, and has never been doubted by this Court. And we are pointed to no principle of law or provision of the Constitution which precludes Congress from making criminal the violation of an administrative regulation, by one who has failed to avail himself of an adequate separate procedure for the adjudication of its validity, or which precludes the practice, in many ways desirable, of splitting the trial for violations of an administrative regulation by committing the determination of the issue of its validity to the agency which created it, and the issue of violation to a court which is given jurisdiction to punish violations. Such a requirement presents no novel constitutional issue.

No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *O'Neil* v. *Vermont,* 144 U. S. 323, 331; *Barbour* v. *Georgia,* 249 U. S. 454, 460; *Whitney* v. *California,* 274 U. S. 357, 360, 362, 380. Courts may for that reason refuse to consider a constitutional objection even though a like objection had previously been sustained in a case in which it was properly taken. *Seaboard Air Line Ry. Co.* v. *Watson,* 287 U. S. 86. While this Court in its

discretion sometimes departs from this rule in cases from lower federal courts, it invariably adheres to it in cases from state courts, see Brandeis, J. concurring in *Whitney* v. *California, supra,* 380, and it could hardly be maintained that it is beyond legislative power to make the rule inflexible in all cases. Compare *Woolsey* v. *Best,* 299 U. S. 1 with *Ex parte Siebold,* 100 U. S. 371.

For more than fifty years it has been a penal offense for shippers and interstate rail carriers to fail to observe the duly filed tariffs fixing freight rates—including, since 1906, rates prescribed by the Commission—even though the validity of those rates is open to attack only in a separate administrative proceeding before the Interstate Commerce Commission. 49 U. S. C. §§ 6 (7), 10 (1); *Armour Packing Co.* v. *United States,* 209 U. S. 56, 81; *United States* v. *Adams Express Co.,* 229 U. S. 381, 388. It is no defense to a prosecution for departure from a rate fixed by the filed tariffs that the rate is unreasonable or otherwise unlawful, where its infirmity has not first been established by an independent proceeding before the Interstate Commerce Commission, and the denial of the defense in such a case does not violate any provision of the Constitution. *United States* v. *Vacuum Oil Co.,* 158 F. 536, 539–41; *Lehigh Valley R. Co.* v. *United States,* 188 F. 879, 887–8. See also *United States* v. *Standard Oil Co.,* 155 F. 305, 309–10, reversed on other grounds, 164 F. 376. Compare *Pennsylvania R. Co.* v. *International Coal Co.,* 230 U. S. 184, 196–7; *Arizona Grocery Co.* v. *Atchison, T. & S. F. Ry. Co.,* 284 U. S. 370, 384. Similarly it has been held that one who has failed to avail himself of the statutory method of review of orders of the Secretary of Agriculture under the Packers and Stockyards Act of 1921, or of the Federal Radio Commission under the Radio Act of 1927, cannot enjoin threatened prosecutions for violation of those orders, *United States* v. *Corrick,* 298 U. S. 435, 440;

*White* v. *Johnson, supra,* 373–4.  See also *Natural Gas Co.* v. *Slattery, supra,* 309–10.[9]

The analogy of such a procedure to the present, by which violation of a price regulation is made penal, unless the offender has established its unlawfulness by an independent statutory proceeding, is complete and obvious. As we have pointed out such a requirement is objectionable only if by statutory command or in operation it will deny, to those charged with violations, an adequate opportunity to be heard on the question of validity. And, as we have seen, petitioners fail to show that such is the necessary effect of the present statute, or that if so applied as to deprive them of an adequate opportunity to establish the invalidity of a regulation there would not be adequate means of securing appropriate judicial relief in the course either of the statutory proceeding or of the criminal trial. During the present term of court we have held that one charged with criminal violations of an order of his draft board may not challenge the validity of the order if he has failed to pursue to completion the exclusive administrative remedies provided by the Selective Training and Service Act of 1940. *Falbo* v. *United States,* 320 U. S. 549; and see *Bowles* v. *United States,* 319 U. S. 33. We perceive no tenable ground for distinguishing that case from this.

We have no occasion to decide whether one charged with criminal violation of a duly promulgated price regulation

---

[9] Compare the provisions of the Packers and Stockyards Act, 7 U. S. C. §§ 194 and 195, and of the Commodity Exchange Act, 7 U. S. C. § 13 (a), imposing criminal sanctions, and those of the Federal Trade Commission Act as amended, 15 U. S. C. §§ 45 (g)–(l) imposing heavy penalties, for violation of an administrative order which has become final by its affirmance upon the exclusive statutory method of review provided, or by the expiration of the time allowed for review without resort to the statutory procedure.

may defend on the ground that the regulation is unconstitutional on its face. Nor do we consider whether one who is forced to trial and convicted of violation of a regulation, while diligently seeking determination of its validity by the statutory procedure, may thus be deprived of the defense that the regulation is invalid. There is no contention that the present regulation is void on its face, petitioners have taken no step to challenge its validity by the procedure which was open to them and it does not appear that they have been deprived of the opportunity to do so. Even though the statute should be deemed to require it, any ruling at the criminal trial which would preclude the accused from showing that he had had no opportunity to establish the invalidity of the regulation by resort to the statutory procedure, would be reviewable on appeal on constitutional grounds. It will be time enough to decide questions not involved in this case when they are brought to us for decision, as they may be, whether they arise in the Emergency Court of Appeals or in the district court upon a criminal trial.

In the exercise of the equity jurisdiction of the Emergency Court of Appeals to test the validity of a price regulation, a jury trial is not mandatory under the Seventh Amendment. Cf. *Block* v. *Hirsh, supra,* 158. Nor has there been any denial in the present criminal proceeding of the right, guaranteed by the Sixth Amendment, to a trial by a jury of the state and district where the crime was committed. Subject to the requirements of due process, which are here satisfied, Congress could make criminal the violation of a price regulation. The indictment charged a violation of the regulation in the district of trial, and the question whether petitioners had committed the crime thus charged in the indictment and defined by Congress, namely, whether they had violated the statute by willful disobedience of a price regulation promulgated by the

Administrator, was properly submitted to the jury. Cf. *Falbo* v. *United States, supra.*

*Affirmed.*

MR. JUSTICE ROBERTS:

I dissent. I find it unnecessary to discuss certain of the questions treated in the opinion of the court. I am of opinion that the Act unconstitutionally delegates legislative power to the Administrator. As I read the opinion of the court it holds the Act valid on the ground that sufficiently precise standards are prescribed to confine the Administrator's regulations and orders within fixed limits, and that judicial review is provided effectively to prohibit his transgression of those limits. I believe that analysis demonstrates the contrary. I proceed, therefore, to examine the statute.

### The Powers Conferred.

When, in his judgment, commodity prices have risen, or threaten to rise, "to an extent or in a manner inconsistent with the purposes" of the Act, the Administrator may establish "such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes" of the Act.

"So far as practicable" in establishing any maximum price, he is to ascertain the prices prevailing in a specified period in 1941 but may use another period nearest to that specified because necessary data for the period specified is not available; and may make adjustments "for such relevant factors as he may determine and deem to be of general applicability," including several factors mentioned. Before issuing any regulation, he shall "so far as practicable" advise with representative members of the industry affected.

Any regulation may provide for adjustments and reasonable exceptions which, in the Administrator's judg-

ment, are necessary and proper to effectuate the purposes of the Act. If, in his judgment, such action is necessary or proper to effectuate the purposes of the Act, he may, by regulation or order, regulate or prohibit speculative or manipulative practices or hoarding in connection with any commodity (50 U. S. C. § 902).

It will be seen that whether, and, if so, when, the price of any commodity [1] shall be regulated depends on the judgment of the Administrator as to the necessity or propriety of such price regulation in effectuating the purposes of the Act.

### The Supposed Standards for the Administrator's Guidance.

The Act provides that any regulation or order must be "generally fair and equitable" in the Administrator's judgment; but coupled with this injunction is another that the order and regulation must be such as, in the judgment of the Administrator, is necessary or proper to effectuate the purposes of the Act.

I turn, therefore, to the stated purposes to ascertain what, if any, limits the statute places upon the Administrator's exercise of his powers.

Section 1 (a) (50 U. S. C. § 901 (a)) states seven purposes, which should be set forth separately as follows:

"to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents;"

In order to exercise his power anent this purpose the Administrator will have to form a judgment as to what stabilization means, and what are speculative, unwarranted and abnormal increases in price. It hardly need be said that men may differ radically as to the connotation of these terms and that it would be very difficult to convict

---

[1] The Act gives the Administrator no power with respect to wages, and limits his powers as respects fishery commodities (50 U. S. C. § 902 (i)), and agricultural commodities (50 U. S. C. § 903).

anyone of error of judgment in so classifying a given economic phenomenon.

"to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency;"

To accomplish this purpose the Administrator must form a judgment as to what constitutes profiteering, hoarding, manipulation or speculation. As if the administrative discretion were not sufficiently broad there is added the phrase "other disruptive practices," which seems to leave the Administrator at large in the formation of opinion as to whether any practice is disruptive.

"to assure that defense appropriations are not dissipated by excessive prices;"

It is not clear—to me at least—what is the limit of this purpose. I can conceive that an honest Administrator might, without laying himself open to the charge of exceeding his powers, make any kind of order or regulation based upon the view that otherwise defense appropriations by Congress might be dissipated by what he considers excessive prices. How his exercise of judgment in connection with this purpose could be thought excessive it is impossible for me to say.

"to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living;"

The Administrator's judgment that any price policy will tend to affect the classes mentioned in this purpose from what he may decide to be "undue impairment of their standard of living" would seem to be so sweeping that it would be impossible to convict him of an error of judgment in any conclusion he might reach.

"to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the

Federal, State, and local governments, which would result from abnormal increases in prices;"

Of course Congress might have included in the catalogue of beneficiaries churches, hospitals, labor unions, banks and trust companies and other praiseworthy organizations, without rendering the "standard" any more vague.

"to assist in securing adequate production of commodities and facilities;"

Here is a purpose which seems, to some extent at least, to permit the easing of price restrictions; for it would appear that diminishment of price would hardly assist in promoting production. Thus the Administrator, and he alone, is to balance two competing policies and strike the happy mean between them. Who shall say his conclusion is so indubitably wrong as to be properly characterized as "arbitrary or capricious."

"to prevent a post emergency collapse of values;"

This purpose, or "standard," seems to permit adoption by the Administrator of any conceivable policy. I have difficulty in envisaging any price policy in support of which some economic data or opinion could not be cited to show that it would tend to prevent post emergency collapse of values.

These seven purposes must, I submit, be considered as separate and independent. Any action taken by the Administrator which, in his judgment, promotes any one or more of them is within the granted power. If, in his judgment, any action by him is necessary or appropriate to the accomplishment of one or more of them, the Act gives sanction to his order or regulation.

Reflection will demonstrate that in fact the Act sets no limits upon the discretion or judgment of the Administrator. His commission is to take any action with respect to prices which he believes will preserve what he deems a sound economy during the emergency and prevent what he considers to be a disruption of such a sound economy

in the postwar period. His judgment, founded, as it may be, on his studies and investigations, as well as other economic data, even though contrary to the great weight of current opinion or authority, is the final touchstone of the validity of his action.

I shall not repeat what I have said in *Bowles* v. *Willingham, post,* p. 503. I have there quoted the so-called standards prescribed in the National Industrial Recovery Act. Comparison of them with those of the present Act, and perusal of what was said concerning them in *Schechter Corp.* v. *United States,* 295 U. S. 495, leaves no doubt that the decision is now overruled. There, as here, the "code" or regulation, to become effective, had to be found by the Executive to "tend to effectuate the policy" of the Act. (See footnote 3, p. 521.)

## *The Administrator's Procedure.*

I have not yet spoken of the statutory provisions respecting the permissible procedure of the Administrator in imposing prices. Sec. 202 (a) (50 U. S. C. § 922 (a)) authorizes him to make such studies and investigations and to obtain such information as he deems necessary or proper to assist him in prescribing any regulation or order, or in the administration and enforcement of the Act and regulations, orders, and price schedules thereunder. The remaining subsections give him broad powers to compel disclosure of information. And he may take official notice of economic data and other facts, including facts found as a result of his investigations and studies (§ 203 (b), 50 U. S. C. § 923 (b)).

Each regulation or order must be accompanied by a "statement of the considerations involved" in its issue (§ 2 (a), 50 U. S. C. § 902 (a)). This is not a statement or finding of fact. Webster defines the term "consideration" as "that which is, or should be, considered as a ground of opinion or action; motive; reason." The citizen,

therefore, is merely to be advised of the reasons for the Administrator's action.

How is he to proceed if he desires to challenge that action? The answer is found in § 203 (50 U. S. C. § 923). Within a specified time after the issue of a regulation any person subject to any provision of it may file a protest "specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections." The Administrator may receive statements in support of the regulations and incorporate them in his proceedings. Within a time fixed he must (1) grant or deny the protest in whole or in part, (2) note it for hearing, or (3) provide an opportunity to present further evidence. His is the choice.

If he denies the protest in whole or in part he must inform the protestant of the grounds upon which his decision was based and of any economic data or other facts of which he has taken official notice.

This, then, is the first opportunity the protestant has to know on what the Administrator has based his "considerations" or reasons for action. As the Emergency Court of Appeals held in *Lakemore Co.* v. *Brown,* 137 F. 2d 355: [2]

"Thus, consistently with statutory requirements, the Administrator could have waited until he had entered his order denying the protest before informing the protestant of the economic data of which he had taken official notice and of the economic conclusions which he had derived therefrom and the other grounds upon which the denial was based."

And it is to be observed that, after seeing the protestant's affidavits and the evidence, the Administrator may load the record with all sorts of material, articles, opinions,

---

[2] In citing cases decided by that court, I do so with no thought that in construing the Act's provisions that court has erred. On the contrary, I cite its interpretations of the statute as supporting my views that, as properly construed, the Act is invalid.

compilations, and what not—pure hearsay—subject to no cross-examination, to persuade the court that his order could, "in his judgment," promote one of the "purposes" of the Act.

Thus is the "record" weighted against formal complaint in court.

*Chatlos* v. *Brown,* 136 F. 2d 490, *Spaeth* v. *Brown,* 137 F. 2d 669, and *Bibb Manufacturing Co.* v. *Bowles,* 140 F. 2d 459, amongst other cases, indicate the sort of data— although they do not exclude the use of other sorts—on which the Administrator seems to be accustomed, and to be entitled, to act. He need make no findings of fact.

### *The Court Review.*

The protestant who is aggrieved by the denial or partial denial of his protest may, within a set time, file a complaint with a specially created Emergency Court of Appeals "specifying his objections and praying that the regulation, order, or price schedule protested be enjoined or set aside in whole or in part." The court is given exclusive jurisdiction and all other courts are forbidden to take jurisdiction to grant such relief. The court may set aside the order, dismiss the complaint, or remand the proceeding. Upon the filing and service of the complaint, the Administrator is to certify and file a transcript of such portion of the proceedings before him as are material to the complaint (§ 204 (a); 50 U. S. C. § 924 (a)).

The section proceeds:

"No objection to such regulation, order, or price schedule, and no evidence in support of any objection thereto, shall be considered by the court, unless such objection shall have been set forth by the complainant in the protest or such evidence shall be contained in the transcript. If application is made to the court by either party for leave to introduce additional evidence which was either offered to the Administrator and not admitted, or which could not

reasonably have been offered to the Administrator or included by the Administrator in such proceedings, and the court determines that such evidence should be admitted, the court shall order the evidence to be presented to the Administrator. The Administrator shall promptly receive the same, and such other evidence as he deems necessary or proper, and thereupon he shall certify and file with the court a transcript thereof and any modification made in the regulation, order, or price schedule as a result thereof; except that on request by the Administrator, any such evidence shall be presented directly to the court."

It is not difficult to picture the plight of the protestant. The Administrator's statement of considerations, without more, constitutes proof in the cause.

In *Montgomery Ward & Co.* v. *Bowles*, 138 F. 2d 669, the Administrator in his statement of considerations said that he took official notice of three propositions of the most general scope. No evidence in support of these or of any other facts upon which he relied was included in the transcript. The complainant suggested to the court the omission of pertinent matter, namely, the evidence in support of the propositions of which the Administrator said he took official notice, the evidence of various other assertions of fact in his opinion, and the particular facts and evidence upon which he based the conclusions expressed in his statement of considerations that "the maximum prices established in this regulation are fair and equitable." The Administrator objected to the suggestion and the court rejected it. It was held that the Act requires "only a summary statement of the basic facts which justify the regulation."

Referring to § 204 (b), 50 U. S. C. § 924 (b), the court held that the requirement that the complainant must establish "to the satisfaction of the court" that the regulation, order, or price schedule is not in accordance with law or is arbitrary or capricious throws upon the protestant

the burden "to bring forward and satisfactorily prove the invalidating facts," and added: "Unless and until he does so the regulation is to be taken as valid and the existence of a state of facts which justify it is to be assumed without the necessity of proof thereof by the Administrator."

The court added that the protestant is given means of carrying this burden by filing affidavits and other evidence, but omits to refer to the fact that these affidavits and other evidence must be addressed to the Administrator's order and his most general and sweeping statement of considerations, which merely means his reasons for making the order. These affidavits and this evidence under the procedure prescribed are to be put in before the protestant even knows what data the Administrator relied upon or sees the Administrator's opinion denying his protest. It is hardly necessary to dilate upon the burden thus placed on a protestant or the extent to which he is compelled to fill the record with what he may think relevant matter only to find that he has been shooting at straws. The court further adverted to the fact that the Act permits the protestant to state in detail in connection with his protest the nature and sources of any further evidence not subject to his control upon which he believes he can rely in support of the facts alleged in his protest. Here again the protestant is under the same handicap. He must disclose all he has in mind to the Administrator before the Administrator makes any disclosure to him of the facts and data upon which that official has relied.

Finally the court refers to the privilege given the protestant to file a brief with the Administrator and to "request an oral hearing," without mentioning the facts that the brief can be addressed only to the reasons given in the statement of consideration, and that the Administrator is at liberty to deny the request.

A procedure better designed to prevent the making of an issue between parties can hardly be conceived.

And the extent of the burden is further emphasized by what the Emergency Court of Appeals has said in *Lakemore Co.* v. *Brown, supra:*

"It is objected that the Administrator thus in effect has prejudged the case; that as witness, immune from cross-examination, he has rendered an opinion which concludes the matter which is before him as judge.

"This overlooks the fact that the Administrator, from the necessities of the case, does not come with a virgin mind to the consideration of a protest. He has previously performed the official act of issuing the regulation, the terms of which of course reflect his conclusions on many economic, administrative and legal questions. In this sense, he necessarily approaches consideration of a protest with certain 'preconceived notions'—to use complainant's phrase. It is the object of the protest procedure to give the Administrator a chance to reconsider any challenged provisions in the regulation in the light of further evidence or arguments which may be advanced by the protestant. What the Administrator did here was to lay his cards on the table in the protest proceedings, offering protestant an opportunity to play its trump cards, if it had any.

"Of course such statements of economic conclusions thus incorporated in the record are not 'evidence.' Section 204 (a) requires the transcript of the protest proceedings, filed in this court, to 'include a statement setting forth, so far as practicable, the economic data and other facts of which the Administrator has taken official notice.' Insofar as any economic generalizations or conclusions formulated by the Administrator constitute indispensable steps in his process of reasoning in denying the protest, it is for this court to say whether they have any rational basis, in performance of our statutory duty to consider whether the regulation or order should be set aside in whole or in part as being 'arbitrary or capricious.' This is so, whether the Administrator includes such generalizations and con-

clusions in his opinion accompanying the denial of the protest or, as in this case, incorporates them into the record of the protest proceedings at an earlier stage in order to afford protestant an opportunity for rebuttal."

. To this may be added what the Emergency Court said in *Madison Park Corp.* v. *Bowles,* 140 F. 2d 316, 324:

"We do not decide that this Court should limit the application of the term 'generally fair and equitable' to standards mentioned in the law and in discussions of its enactment while pending in Congress. It may be possible that a case will occur in which the effect of a regulation established by the Administrator clearly will be shown to be generally unfair and inequitable on grounds not mentioned. But in such a case the reasons must be clear and compelling. The Act provides the Administrator may establish such rents as *in his judgment* will be generally fair and equitable. Review in this Court is plainly limited. It may not substitute its judgment for the judgment of the Administrator, but may act in review only when it finds the regulation is not in accordance with law or is arbitrary and capricious. Thus if the Court finds any reasonable basis to support the view that the regulation deals fairly and equitably with the industry concerned, the regulation must stand." (Italics in original.)

When these cumulative burdens placed upon the protestant who seeks review are fairly appraised it becomes apparent that he must carry an insupportable load, and that, in truth, the court review is a solemn farce in which the Emergency Court of Appeals, and this court, on certiorari, must go through a series of motions which look like judicial review but in fact are nothing but a catalogue of reasons why, under the scheme of the Act, the courts are unable to say that the Administrator has exceeded the discretion vested in him.

No court is competent, on a mass of economic opinion consisting of studies by subordinates of the Administrator,

charts and graphs prepared in support of the studies, and economic essays gathered hither and yon, to demonstrate, beyond doubt, that the considerations or conclusions of the Administrator from such material cannot support the Administrator's judgment that what he has done by way of regulation or price schedule tends to prevent postwar collapse of values, or to prevent dissipation of defense appropriations through excessive prices, or to prevent impairment of the standard of living of persons dependent on life insurance, or to prevent hardship to schools—to enumerate but a few of the stated purposes of the Act.

It is not surprising that, in the thirty-one cases decided by the Emergency Court of Appeals of which I have found reports, complaints have been dismissed in twenty-eight, and but three have been remanded to the Administrator for further proceedings.[3] Two of the three involved no question of merits under the statutory provisions.

### The War Power.

The Emergency Court of Appeals in *Taylor* v. *Brown*, 137 F. 2d 654, overruled a challenge to the constitutional validity of the Act's delegation of legislative power to the Administrator by invocation of the "War Power" of Congress, the powers embodied in Article I, § 8, of the Constitution "to declare War," "to raise and support Armies," "to provide and maintain a Navy," and "to make all Laws which shall be necessary and proper for carrying into Execution" those powers. After showing, what needs no argument, that these powers of Congress are very different from those to be exercised in peace, the court then— without a sign that it realizes the great gap in the process— assumes that one of Congress' war powers is the power to transfer its legislative function to a delegate. By the

---

[3] *Armour & Co.* v. *Brown*, 137 F. 2d 233; *Montgomery Ward & Co.* v. *Bowles*, 138 F. 2d 669; *Hillcrest Terrace Corp.* v. *Brown*, 137 F. 2d 663.

same reasoning it could close this court or take away the constitutional prerogatives of the President as "War measures."

I am not sure how far this court's present opinion adopts the same view. There are references in it to the war emergency, and yet the reasoning and the authorities cited seem to indicate that the delegation would be good in peacetime and in respect of peacetime administration. And the Emergency Court of Appeals, in spite of its decision in *Taylor* v. *Brown, supra,* and its statement in *Philadelphia Coke Co.* v. *Bowles,* 139 F. 2d 349, that, as the Act is an exercise of the war power and therefore does not deprive citizens of property without due process, has, nevertheless, weighed provisions of the Act as against the guaranty of the Fifth Amendment in *Wilson* v. *Brown,* 137 F. 2d 348, and in *Avant* v. *Bowles,* 139 F. 2d 702.

I am sure that my brethren, no more than I, would say that Congress may set aside the Constitution during war. If not, may it suspend any of its provisions? The question deserves a fair answer. My view is that it may not suspend any of the provisions of the instrument. What any of the branches of government do in war must find warrant in the charter and not in its nullification, either directly or stealthily by evasion and equivocation. But if the court puts its decision on the war power I think it should say so. The citizens of this country will then know that in war the function of legislation may be surrendered to an autocrat whose "judgment" will constitute the law; and that his judgment will be enforced by federal officials pursuant to civil judgments, and criminal punishments will be imposed by courts as matters of routine.

If, on the contrary, such a delegation as is here disclosed is to be sustained even in peacetime, we should know it.

MR. JUSTICE RUTLEDGE, dissenting:

I agree with the Court's conclusions upon the substantive issues. But I am unable to believe that the trial af-

forded the petitioners conformed to constitutional require-
ments. The matter is of such importance as requires a
statement of the reasons for dissent.

The Emergency Price Control legislation is unusual, if
not unique. It is streamlined law in both substance and
procedure. More than any other legislation except per-
haps the Selective Service Act, in the combined effect of
its provisions it attenuates the rights of affected individ-
uals. The Congress regarded this as necessary, though it
sought to preserve as much of individual right as it felt
was consistent with controlling wartime inflation. To
that judgment we owe all deference, saving only what we
owe to the Constitution.

War such as we now fight calls into play the full power
of government in extreme emergency. It compels in-
vention of legal, as of martial tools adequate for the times'
necessity. Inevitably some will be strange, if also life-
saving, instruments for a people accustomed to peace and
the normal working of constitutional limitations. Citi-
zens must surrender or forego exercising rights which in
other times could not be impaired. But not all are lost.
War expands the nation's power. But it does not suspend
the judicial duty to guard whatever liberties will not
imperil the paramount national interest.

## I.

Judged by normal peacetime standards, over-all nation-
wide price control hardly has accepted place in our insti-
tutions. Notwithstanding the considerable expansion of
recent years in this respect, the extension has been piece-
meal.[1] Until now it has not enveloped the entire econ-
omy.[2] Whether control so extensive might be upheld in
some emergency not created by war need not now be de-

---

[1] Cf., e. g., *Nebbia* v. *New York*, 291 U. S. 502.

[2] Perhaps the nearest previous approach to control so extensive was
in the National Industrial Recovery legislation.

cided. That it can be supported in the present circumstances and for the declared purposes there can be no doubt. It is enough, as the Court points out, that legal foundation exists in the nation's power to make war, as this has been given to Congress and the Chief Executive. Cf. *Hirabayashi* v. *United States,* 320 U. S. 81.[3]

The foundation has relevance for each of the issues. And generally it has significance for the application of peacetime precedents. Decisions made then with limitations, explicit or implied, not affected by influence of the war power and the conditions of a state of war, cannot be wholly conclusive in their limiting effect upon the exercise of war-making authority. Care must be taken therefore, in applying them, both to see that they are observed so far as the dominant necessity permits and to be equally sure they are not misapplied to hamstring essential authority.[4]

As it is with the substantive control, so it is with delegating legislative power. War begets necessities for this, as for imposing substantive controls, not required by the lesser exigencies of more normal periods. In this respect certainly there is as much room for difference as exists when Congress is dealing wholly with internal matters and when it is acting with the President about foreign affairs. Cf. *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304. Not only the broader power of Congress, but its conjunction in the particular delegation with the wider authority of the President, both as chief magistrate and as commander-in-chief, goes to sustain the greater delegation. Cf. *Hirabayashi* v. *United States, supra.* But the present legislation, as the Court's opinion demon-

[3] Cf. note 18 *infra.*

[4] It goes without saying that whatever scope is allowed for operation of governmental authority in peace continues to be effective in war.

strates, does not go beyond the limits allowed by peacetime precedents in the substantive delegation.[5]

## II.

My difficulty arises from the Act's procedural provisions. They too are unusual. That is true, though each save one has been used before, and sustained, in separate applications. No previous legislation has presented quite this combination of procedural devices.[6] In the combination, if in nothing more, unique quality would be found. But there is more.

Congress sought to accomplish two procedural objectives. One was to afford a narrow but sufficient method for securing review and revision of the regulations. At the same time, the Act created broad and ready methods for enforcement. The short effect of the procedure is to give the individual a single channel for questioning the validity of a regulation, through the protest procedure and the Emergency Court of Appeals, with review of its decisions here on certiorari. § 204. On the other hand, the varied and widely available means for enforcement include criminal proceedings, suits in equity, and suits for recovery of civil penalties, in the federal district courts and in the state courts. § 205 (a), (b), (c). See also

---

[5] E. g., the administrator has no power to adopt codes of fair competition generally, such as was given under N. I. R. A. His principal function is single, to determine and make effective by regulation the maximum price at which a commodity may be sold. The task is vast and complex, in comparison with previously sustained price-fixing delegations, by virtue of the number of industries and items affected and the nation-wide scope of the authority. But the focus of the price-fixing function is narrow, although powerful, in its incidence upon a particular industry or operator.

[6] Cf. Judicial Review of Price Orders under the Emergency Price Control Act (1942) 37 Ill. L. Rev. 256, 263–264; and other materials cited *infra* notes 20, 21.

§ 205 (d), (e), (f).[7]   And in all these enforcement proceedings the mandate of § 204 (d) is that the court shall have no "jurisdiction or power to consider the validity of" a regulation, order or price schedule.   The statute thus affords the individual, to question a regulation's validity, one route and that a very narrow one, open only briefly. The administrator and others, to enforce it, have many. And in the enforcement proceedings the issues are cut down so that, in a practical sense, little else than the fact whether a violation of the regulation as written has occurred or is threatened may be inquired into.[8]

Disparity in remedial and penal measures does not necessarily invalidate the procedure, though it has relevance to adequacy of the remedy allowed the individual.[9] Congress has broad discretion to open and close the doors to litigation.   In doing so it may take account of the necessities presented by such a situation as it was dealing with here.   To follow the usual course of legislation and permit challenge by restraining orders, injunctions, stay orders and the normal processes of litigation would have been, in this case, to lock the barn door after the horse had been stolen.   There was therefore compelling reason for Congress to balance the scales of litigation unevenly, if only it did not go too far.   In no other way could it protect the paramount national interest.   If the result, within the permissible limits, is harsh or inconvenient for

[7] By § 205 (f) (1), (2) licensing authority is given to the administrator, with special provisions for suspension for not more than twelve months by proceedings in state, territorial or federal district courts.

[8] It is conceded that questions concerning the validity of statutory provisions, as distinguished from regulations, remain determinable by enforcing courts.   See Sen. Rep. No. 931, 77th Cong., 2d Sess., 24–25, and compare H. R. 5479, 77th Cong., 1st Sess., printed in Hearings before Committee on Banking and Currency on H. R. 5479, 77th Cong., 2d Sess., 4, 7–8.

[9] Cf. Parts IV, V, infra.

the individual, that is but part of the price he, with all others, must pay for living in a nation which ordinarily gives him so much of protection but in a world which has not been organized to give it security against events so disruptive of democratic procedures.

I have no difficulty with the provision which confers jurisdiction upon the Emergency Court of Appeals to determine the validity of price regulations or, if that had been all, with the mandate which makes its jurisdiction in that respect exclusive. Equally clear is the power of Congress to deprive the other federal courts of jurisdiction to issue stay orders, restraining orders, injunctions or other relief to prevent the operation of price regulations or to set them aside. So much may be rested on Congress' plenary authority to define and control the jurisdiction of the federal courts. Constitution, Article III, § 2; *Lockerty* v. *Phillips*, 319 U. S. 182. It may be taken too, for the purposes of this case, that Congress' power to channel enforcement of federal authority through the federal courts sustains the like prohibitions it has placed on the state courts.[10] Without more, the statute's provisions would seem to be unquestionably within the Congressional power. Cf. *Myers* v. *Bethlehem Shipbuilding Corp.*, 303 U. S. 41.

Congress however was not content to create a single national tribunal, give it exclusive jurisdiction to determine all cases arising under the statute, and deny jurisdiction over them to all other courts.[11] It provided for en-

---

[10] *The Moses Taylor*, 4 Wall. 411; *Bowles* v. *Willingham, post,* p. 503; cf. *Claflin* v. *Houseman*, 93 U. S. 130; *Plaquemines Tropical Fruit Co.* v. *Henderson*, 170 U. S. 511.

[11] This it might have done, subject only to the requirement that the procedure specified for the single competent court afford a constitutionally adequate mode for determining the issues. *Myers* v. *Bethlehem Shipbuilding Corp., supra.* In case criminal jurisdiction were conferred, observance of the requirements of Article III, § 2, and of the

forcement by civil and criminal proceedings in the federal district courts and in the state courts throughout the country.

This, too, it could do, though only if adequate proceedings, in the constitutional sense, were authorized. And I agree that the enforcing jurisdiction would not be made inadequate merely by the fact that no stay order or other relief could be had pending the outcome of litigation. Confronted as the nation was with the imminent danger of inflation and therefore the necessity that price controls should become effective at once and continue so without interruption at least until invalidated in particular instances, Congress could require individuals to sustain, in deference to the paramount public interest, whatever harm might ensue during the period of litigation and until each had demonstrated the invalidity of the regulation as it affected himself.[12] Runaway inflation could not have been avoided in any other way. The lid had to go on, go on tight and stay tight. This necessity united with the general presumption of validity which attaches to legislation[13] and Congress' power to control the jurisdiction of the courts to sustain its denial of power to all courts, including the enforcing courts, the Emergency Court and this one,[14] to suspend operation of the regulations pending final determination of validity.

---

Fifth and Sixth Amendments concerning such trials would be required. Cf. text *infra*, Parts V, VI.

[12] Cf. *L'Hote* v. *New Orleans*, 177 U. S. 587; *Welch* v. *Swasey*, 214 U. S. 91; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U. S. 146.

[13] *Metropolitan Casualty Ins. Co.* v. *Brownell*, 294 U. S. 580; *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152–154.

[14] By § 204 (b) of the Act, the effectiveness of a judgment of the Emergency Court enjoining or setting aside the regulation, in whole or in part, is postponed until the expiration of thirty days from its entry and, if certiorari is sought here within that time, the postponement continues until this Court's denial of the writ becomes final or until other

The crux of this case comes, as I see it, in the question whether Congress can confer jurisdiction upon federal and state courts in the enforcement proceedings, more particularly the criminal suit, and at the same time deny them "jurisdiction or power to consider the validity" of the regulations for which enforcement is thus sought. This question which the Court now says "presents no novel constitutional issue" was expressly and carefully reserved in *Lockerty* v. *Phillips, supra.* The prohibition is the statute's most novel feature. In combination with others it gives the procedure a culminating summary touch and presents questions different from those arising from the other features.

The prohibition is unqualified. It makes no distinction between regulations invalid on constitutional grounds and others merely departing in some respect from statutory limitations, which Congress might waive, or by the criterion whether invalidity appears on the face of the regulation or only by proof of facts. If the purpose and effect are to forbid the enforcing court to consider all questions of validity and thus to require it to enforce regulations which are or may be invalid for constitutional reasons, doubt arises in two respects. First, broad as is Congress' power to confer or withhold jurisdiction, there has been none heretofore to confer it and at the same time deprive the parties affected of opportunity to call in question in a criminal trial whether the law, be it statute or

---

final disposition of the case by this Court. By § 204 (d) the Emergency Court and this Court are given exclusive jurisdiction to determine the validity of the regulation and all other courts are denied "jurisdiction or power to consider" this question and to stay, restrain, enjoin or set aside any provision of the regulation or its enforcement. The net effect is to deprive all courts of power to suspend operation of the regulation pending final decision on its validity and to keep it in force until a final judgment of the Emergency Court, or of this Court on review of its decision, becomes effective.

regulation,[15] upon which the jurisdiction is exercised squares with the fundamental law. Nor has it been held that Congress can forbid a court invested with the judicial power under Article III to consider this question, when called upon to give effect to a statutory or other mandate.

It is one thing for Congress to withhold jurisdiction. It is entirely another to confer it and direct that it be exercised in a manner inconsistent with constitutional requirements or, what in some instances may be the same thing, without regard to them. Once it is held that Congress can require the courts criminally to enforce unconstitutional laws or statutes, including regulations, or to do so without regard for their validity, the way will have been found to circumvent the supreme law and, what is more, to make the courts parties to doing so. This Congress cannot do. There are limits to the judicial power. Congress may impose others. And in some matters Congress or the President has final say under the Constitution. But whenever the judicial power is called into play, it is responsible directly to the fundamental law and no other authority can intervene to force or authorize the judicial body to disregard it. The problem therefore is not solely one of individual right or due process of law. It is equally one of the separation and independence of the powers of government and of the constitutional integrity of the judicial process, more especially in criminal trials.

## III.

The idea is entirely novel that regulations may have a greater immunity to judicial scrutiny than statutes have, with respect to the power of Congress to require the courts to enforce them without regard to constitutional require-

---

[15] Cf. text *infra*, Part III, at notes 16, 17.

ments. At a time when administrative action assumes more and more of the law-making function,[16] it would seem the balance of advantage, if any, should be the other way. But there is none. The statute has impact upon individuals only through the regulations. They are in effect part of the Act itself, unless invalid. If invalid, they rule, just as the statute does, until set aside. And, in respect to constitutional requirements, they have no more immunity than the statute itself.[17]

Clearly Congress could not require judicial enforcement of an unconstitutional statute. The same is true of an unconstitutional regulation. And it is conceded that Congress could not have compelled judicial enforcement of all price regulations, without regard to their validity, if it had not given opportunity for attack upon them through the Emergency Court or if that opportunity is inadequate. But because the opportunity is afforded and is deemed adequate in the unusual circumstances, at any rate for some of its purposes, and because it was not followed, the Court holds that criminal enforcement must be given and the enforcing court cannot consider the question of validity.

---

[16] There hardly can be question that whenever an administrative agency, acting within the discretion validly conferred upon it by Congress, promulgates a regulation or issues an order of general applicability it is "making the law," as effectively as is Congress when it enacts a specific prescription, by whatever name this may be called. *United States* v. *Grimaud*, 220 U. S. 506; *Avent* v. *United States*, 266 U. S. 127; *United States* v. *Michigan Portland Cement Co.*, 270 U. S. 521.

[17] Cf. the dissenting opinion of Mr. Justice Roberts. The notion that Congress somehow could cut off review of regulations for constitutional invalidity when it could not do so for statutes, of which suggestions appear in the legislative history and the briefs, was not adhered to in the oral argument as to regulations void on their face and is not tolerable when the effect would be to make the courts instruments for enforcing unconstitutional mandates. Cf. Part VI, *infra*.

If I understand it, the argument to sustain the conviction, in its broadest form, rests upon the proposition that Congress, by providing in one proceeding a constitutionally adequate mode for deciding upon the validity of a law or regulation, and requiring this to be followed within a limited time, can cut off all other right to question it and make that determination, or the failure to secure it in time, conclusive for all purposes and in all other proceedings. The proposition cannot be accepted in that broad form. To do so would mean, for instance, that if in this case a regulation had prescribed one maximum price for sales by merchants of one race or religion and a lower one for distributors of another, the judicial power of the United States would have to be exercised to convict the latter for selling at the formers' price, if they had not availed themselves of the limited review afforded by this Act. It hardly would be consistent with accepted ideas of due process or equal protection for any court to impose penalty or restraint in such a case.[18] And I cannot imagine this Court as sustaining such a conviction or any other as imposing it.[19]

The illustration is extreme and improbable of occurrence. But it serves to test the broad contention. Such a doctrine established as generally applicable would contain seeds of influence too dangerous for acceptance, more especially for the determination of criminal matters. No authority compels or enjoins this. And I am unwilling to give the idea adherence in particular applications without stating qualification which confines its possible effects

---

[18] See note 17 *supra*. The unique circumstances involved in *Hirabayashi* v. *United States*, 320 U. S. 81, confine that case to its facts, including the particular emergency with which legislation there under review had dealt, as respects the issue of equal protection.

[19] Cf. notes 23, 33 *infra*.

to situations where the gravest dangers to the nation's interest exist and cannot be escaped in any other way.

The question narrows therefore to the inquiry, in what circumstances and under what conditions may Congress, by offering the individual a single chance to challenge a law or an order, foreclose for him all further opportunity to question it, though requiring the courts to enforce it by criminal processes? This question is the most important one in the case and demands explicit attention. "It is easy enough to say that a party has enough of a remedy if statutory review of the order is available and if he does not choose to employ that procedure he should be foreclosed from raising elsewhere the questions that could have been raised in that proceeding." [20] But to make this easy assumption is at once to decide the rock-bottom issue and, in my opinion, one this Court has not determined heretofore with effects upon the criminal process like those produced in this case.[21]

## IV.

It is true that in a variety of situations and for a variety of reasons a person is foreclosed from raising issues, including some constitutional ones, where he has failed to exercise an earlier opportunity. Thus ordinarily issues cannot be raised on appeal which were not presented in

[20] McAllister, Statutory Roads to Review of Federal Administrative Orders (1940) 28 Calif. L. Rev. 129, 166.

[21] *Ibid.* Cf. Judicial Review of Price Orders Under the Emergency Price Control Act (1942) 37 Ill. L. Rev. 256, 263; Stason, Timing of Judicial Redress from Erroneous Administrative Action (1941) 25 Minn. L. Rev. 560, 575, 576–581; Administrative Features of the Emergency Price Control Act (1942) 28 Va. L. Rev. 991, 998, 999; Reid and Hatton, Price Control and National Defense (1941) 36 Ill. L. Rev. 255, 283–284. For an analysis of litigation under this Act see Sprecher, Price Control in the Courts (1944) 44 Col. L. Rev. 34.

the trial court. And a variant is that federal questions not raised in the state courts generally will not be considered here.[22]

But such instances of foreclosure, whether legislative or judicial in origin, do not support the broader basis of argument in this case. Two things are to be emphasized. One is that the previous opportunity is in an earlier phase of the same proceeding, not as here a separate and independent one of wholly different character. In other words, the determination of guilt or other matter ultimately in issue is not cut up into two separate, distinct and independent proceedings in different tribunals, in which neither body has power to consider and decide all the issues, but each can determine them only in part. The other thing for stress is that the foreclosure by failure to take the earlier chance is not universally effective. And this is true particularly of constitutional questions, some of which may be raised at any time.[23] While Congress has plenary power to confer

---

[22] The foreclosure may be founded upon notions of waiver, comity, putting an end to litigation, securing orderly procedure or the advantages of having available for consideration in the later stages the informed judgment of the trial tribunal, or some combination of these and other considerations. Cf. Stason, Timing of Judicial Review from Erroneous Administrative Action (1941) 25 Minn. L. Rev. 560, 576–581; Berger, Exhaustion of Administrative Remedies (1939) 48 Yale L. J. 980, 1006. And the rule against allowing collateral attack, where a judgment is involved, is relevant to the broad problem of foreclosure.

[23] Commonly it is said that "jurisdictional" questions, particularly concerning the court's power to deal with the subject matter, may be raised at any stage or in a collateral attack. And this seems to be true also of some other constitutional issues through challenge to judgments by habeas corpus proceedings long after the judgment has become final. Cf., e. g., Ex parte Virginia, 100 U. S. 339; Ex parte Siebold, 100 U. S. 371; Johnson v. Zerbst, 304 U. S. 458; Mooney v. Holohan, 294 U. S. 103. Compare Revised Rules of the Supreme Court of the

or withhold appellate jurisdiction, cf. *Ex parte McCardle,* 7 Wall. 506, it has not so far been held, and it does not follow, that Congress can confer it, yet deny the appellate court "power to consider" constitutional questions relating to the law in issue.

If the foreclosure is not always effective when the earlier phase of litigation is wholly judicial, it hardly should be when this consists of administrative or of both administrative and judicial proceedings, still less when these are civil in character and the later enforcement phase is criminal. In the enforcement of administrative orders the courts have been assiduous, perhaps at times extremely so,[24] to see that constitutional protections to the persons affected are observed. By trial and error, ways have been found to give the administrative process scope for effective action and yet to maintain individual security against abuse, especially in respect to constitutional rights.[25] The instances closest to the problem here have provided for attaching penalties, including criminal sanctions, to violations of orders. But generally by one method or another means have been supplied for postponing their impact, at any rate irrevocably, until after the order's validity has

United States, Rule 27, paragraph 6; cf. *Weems* v. *United States,* 217 U. S. 349, 362; *Columbia Heights Realty Co.* v. *Rudolph,* 217 U. S. 547; *Brasfield* v. *United States,* 272 U. S. 448; *Mahler* v. *Eby,* 264 U. S. 32, 45.

[24] Compare *Ohio Valley Water Co.* v. *Ben Avon Borough,* 253 U. S. 287; *Crowell* v. *Benson,* 285 U. S. 22; *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38; *Utah Fuel Co.* v. *National Bituminous Coal Comm'n,* 306 U. S. 56, with *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41.

[25] E. g., compare *Federal Trade Commission* v. *Gratz,* 253 U. S. 421 with *Labor Board* v. *Mackay Radio Co.,* 304 U. S. 333; cf. also *Morgan* v. *United States,* 298 U. S. 468; 304 U. S. 1; *United States* v. *Morgan,* 307 U. S. 183. Compare note 24 *supra;* and see *Ng Fung Ho* v. *White,* 259 U. S. 276.

been established.[26] And in that effort this Court has joined.[27]

Whatever may be the limitations on judicial review in criminal proceedings under other administrative enforcement patterns,[28] no one of these arrangements goes as far as the combination presented by this Act. It restricts the individual's right to review to the protest procedure and appeal through the Emergency Court of Appeals Both are short-cut proceedings, trimmed almost to the bone of due process, even for wholly civil purposes, and pared down further by a short statute of limitations. Protest must be filed within the sixty-day period. After that time, no protest can be made and no review can be

---

[26] Thus, in some cases review and enforcement are concentrated exclusively in the same court. Cf. National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151 et seq., giving the circuit courts of appeal exclusive jurisdiction to review and enforce the board's orders, to which no penalty attaches until the board has sought and obtained an order from the court for enforcement. With this done, there is no danger the individual will be sentenced for crime for failure to comply with an invalid order. And there is none that the court will be called upon to lend its hand in enforcing an unconstitutional edict or, for that matter, one merely in excess of statutory authority. Likewise, when there is provision for stay or suspension of the order pending determination of its validity, e. g., the Securities Act of 1933, 48 Stat. 81, 15 U. S. C. § 77i; the Securities Exchange Act of 1934, 48 Stat. 902, 15 U. S. C. § 78y; the Public Utility Holding Company Act of 1935, 49 Stat. 835, 15 U. S. C. § 79x. And this is true where the enforcing court is not forbidden to consider the validity of the order, a prohibition entirely novel to the Emergency Price Control Act.

[27] Cf. Wadley Southern Ry. Co. v. Georgia, 235 U. S. 651, and authorities cited. In notable instances, also, where no specific provision has been made for either judicial review or avoiding the irrevocable impact of possibly invalid administrative action, and review has not been expressly denied, the courts have been ready to find means for review and for averting the impact of the penalty until it has been had. E. g., Ex parte Young, 209 U. S. 123; cf. Southern Ry. Co. v. Virginia, 290 U. S. 190.

[28] Cf. McAllister, op. cit. supra, note 20; and note 26 supra.

had, except upon grounds arising later. § 203 (a).[29] The only *right* is to submit written evidence and argument to the administrator. § 203 (c). There is none to present additional evidence to the court.[30] Necessarily there is none of cross-examination. No court can suspend the order unless or until a judgment of the Emergency Court invalidating it becomes final.[31] The penalties, civil and criminal, attach at once on violation and, it would seem, until the contrary is decided, with finality.[32] At any rate,

[29] Apparently it is contemplated that the "affidavits or other written evidence" submitted in support of the objections be filed with the protest, though later submissions may be made at times and under regulations prescribed by the administrator, or when ordered by the Emergency Court, or to that court when the administrator requests. §§ 203 (a), 204 (a). The administrator is authorized to permit filing of protest after the sixty days have expired solely on grounds arising after that time. § 203 (a). He is required to grant or deny the protest, in whole or in part, notice the protest for a hearing, or provide an opportunity to present further evidence, within thirty days after the protest is filed or ninety days after issuance of the regulation or order, or in the case of a price schedule ninety days from the effective date, whichever occurs later. *Ibid.*

[30] Cf. note 29 *supra.* In the Emergency Court of Appeals, "no objection to [the] regulation . . . and no evidence in support of any objection thereto, shall be considered . . . unless such objection" has been set forth in the protest or such evidence is in the transcript. Additional evidence can be admitted only if it was "either offered to the Administrator and not admitted [by him] or . . . could not reasonably have been offered to . . . or included by the Administrator in such proceedings." In that case it is to be presented to the administrator, received by him and certified to the court together with any modification he may make in the regulation. Where the administrator so requests, however, such additional evidence "shall be presented directly to the court." § 204 (a).

[31] Cf. note 14 *supra.*

[32] That is true whether the infraction occurs before or after the time for protest or appeal has passed and, it would seem, notwithstanding the protestant may proceed with all diligence. The statute makes no provision for relieving from its penal sanctions one who follows the protest procedure to the end in case the protest eventually

that is the statute's purport. In short, the statute as drawn makes not only the regulation but also the penalties immediately and fully effective without regard to whether protest is made, the protest proceeding is carried to conclusion, or what the conclusion may be, except, and this is by inference, that violation after the order finally is held invalid may not be punishable.

This is the scope and reach of the statute. It is greater than any this Court heretofore has sustained.[33] It places

---

is sustained, if meanwhile he disobeys the order. Punishment is not made dependent on or required to await the outcome of that proceeding. Rather, the enforcing court is commanded not to consider validity. The command is unqualified, unvarying and universal. It is cast in the compelling terms of "jurisdiction." Under the statute's provisions, it applies as much when trial and conviction occur before the Emergency Court's decision is final as afterwards.

[33] Cf. *Bradley* v. *Richmond,* 227 U. S. 477, which involved a state prosecution for violating a state law. In affirming the conviction this Court rejected the contention that the administrative determination on which prosecution rested was unconstitutional. But it would not follow from the fact a state might thus condition its criminal proceedings consistently with the Fourteenth Amendment's requirement of due process that Congress can do likewise for federal criminal trials. Cf. *infra* Part V. *Wadley Southern Ry. Co.* v. *Georgia, supra,* also involved a state suit for civil penalty for violation of a state administrative order, to which the limitations of the Sixth Amendment would not apply. The dicta which the Court regards as pointing to the validity of the procedure here do not sustain it, not only for this reason, but because the special procedure was different, did not purport to foreclose defense to enforcement if not followed, and expressly asserted that, if followed, penalty could be imposed only for violations taking place after the order was adjudicated valid, not beforehand. This case involves the very risk the Court there said could not be imposed.

Other instances relied on by the Court involve only civil, not criminal consequences, or distinguishable instances of criminal prosecution, and therefore have no conclusive bearing here. As the Court seems to recognize, the question now presented was not presented or considered in *Armour Packing Co.* v. *United States,* 209 U. S. 56, or in *United States* v. *Adams Express Co.,* 229 U. S. 381. And it was not

the affected individual just where the Court, speaking through Mr. Justice Lamar in *Wadley Southern Ry. Co.* v. *Georgia,* 235 U. S. 651, 662, said he could not be put: "He must either obey what may finally be held to be a void order, or disobey what may ultimately be held to be a lawful order." Yet the Court holds this special proceeding "adequate" and therefore effective to foreclose all opportunity for defense in a criminal prosecution on the ground the regulation is void.

This is no answer. A procedure so summary, imposing such risks, does not meet the requirements heretofore considered essential to the determination or foreclosure of issues material to guilt in criminal causes. It makes no difference that petitioners did not follow the special procedure. The very question, posed in the Court's own terms, is whether, if they had followed it, the remedy would be adequate constitutionally. It cannot be, under previously accepted ideas, if for one who follows it to a favorable judgment the penalty yet may fall. That question the Court does not decide. Unless it is decided, the question of adequacy, in any sense heretofore received, has not been determined, or an entirely new conception of adequacy has been approved.

---

involved or determined in the cited decisions, either here or in the inferior federal courts, dealing with carriers who violate tariffs framed and filed by themselves and thereby become subject to penalty. The same is true of the cases holding that threatened criminal prosecution for violation of administrative orders cannot be enjoined.

In these decisions, none of the statutes forbade the enforcing court "to consider the validity" of the orders, none afforded a special proceeding so summary as that provided here, and only *United States* v. *Vacuum Oil Co.,* 158 F. 536, raised a constitutional question relevant here. *Falbo* v. *United States,* 320 U. S. 549, involved a different procedure and a different and more urgent problem. Compare Part VII *infra.* It may be doubted the decision's effect is to preclude the enforcing court from examining constitutional questions affecting the order's validity.

## V.

But there is a deeper fault, even if we assume what neither the statute nor the Court's opinion today justifies, that a potential offender who successfully challenges the constitutionality of a regulation or begins a challenge on constitutional grounds in the Emergency Court at any time before or during the criminal prosecution, cannot be convicted, at least until after final decision that the order is valid. There still remain those cases where he has either challenged unsuccessfully in the Emergency Court or has not challenged at all. In them the would-be offender is subject to criminal prosecution without a right to question in the criminal trial the constitutionality of the regulation on which his prosecution and conviction hinge. And this seems to be true without distinction as to the character of the ground on which he seeks to make the issue. To say that this does not operate unconstitutionally on the accused because he has the choice of refraining from violation or of testing the constitutional questions in a civil proceeding beforehand entirely misses the point. The fact is that if he violates the regulation he must be convicted, in a trial in which either an earlier and summary civil determination or the complete absence of a determination forecloses him on a crucial constitutional question. In short, his trial for the crime is either in two parts in two courts or on only a portion of the issues material to guilt in one court. This may be all very well for some civil proceedings. But, so far as I know, criminal proceedings of this character never before have received the sanction of Congress or of this Court. That, like many other criminals, an offender here can be punished for making the wrong guess as to the constitutionality of the regulation, I have no doubt. But that, unlike all other criminals, he can be convicted on a trial in two parts, one so summary and civil and the other criminal

or, in the alternative, on a trial which shuts out what may be the most important of the issues material to his guilt, I do deny.

The Sixth Amendment guarantees to the accused "in all criminal prosecutions . . . the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." By Article III, § 2, "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed. . . ." And, by the same section, "The judicial Power," which is vested in the supreme and inferior courts by § 1, "shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority."

By these provisions the purpose hardly is to be supposed to authorize splitting up a criminal trial into separate segments, with some of the issues essential to guilt triable before one court in the state and district where the crime was committed and others, equally essential, triable in another court in a highly summary civil proceeding held elsewhere, or to dispense with trial on them because that proceeding has not been followed.[34] If the validity of the

---

[34] Nor, according to accepted notions of the criminal process, has it ever been contemplated that some of the issues of fact should be provable by confrontation of witnesses and others by written evidence only, when other evidence is or may be available. If, for instance, Congress should define an act as a crime, but should require that in the trial issues relating to the validity of the law furnishing the basis for the charge should be proven only by affidavit, though others by the normal processes of proof, the proceeding hardly could be held to comport with the kind of trial the Constitution, and more particularly the Sixth Amendment requires. And if Congress should go further and provide for determination of the issues triable only by affidavit in a court or other body sitting elsewhere than in the state and district of the crime, with other issues triable before a court with a jury empanelled there, but with that court compelled to give finality

order, on constitutional or other grounds, has any substantial relationship to the petitioners' guilt, and it cannot be denied that it does, the short effect of the procedure is to chop up their trial into two separate, successive and distinct parts or proceedings, in each of which only some of the issues determinative of guilt can be tried, the two being connected only by the thread of finality which runs from the decision of the first into the second. The effect is to segregate out of the trial proper issues, whether of law or of fact, relating to the validity of the law for violation of which the defendants are charged, and to leave to the criminal court only the determination of whether a violation of the regulation as written actually took place and whether in some other respect the statute itself is invalid. If Congress can remove these questions, it can remove also all questions of validity of the statute or, it would seem, of law.

The consequences of this splitting hardly need further noting. On facts and issues material to validity of the regulation the persons charged are deprived of a full trial in the state or district where the crime occurs, even if the Emergency Court sits there, as it is not required to do. Their right to try those constitutional issues both of fact and of law on which a criminal conviction ultimately will hinge, is restricted rigidly to the introduction of written evidence before the administrator in a proceeding barely adequate, even under special circumstances like these, to meet the requirements of due process of law in civil proceedings. The court which makes the decision on these issues cannot consider the facts constituting the violation. It has no power to pass judgment of guilty or not guilty upon the whole of the evidence. It can only pronounce

to the other's findings against the accused, the departure from constitutional requirements would seem to be only the more obvious. This is not far in effect, if it is at all, from what has been done here.

the law valid or invalid in a setting wholly apart from any charge of crime, from the facts alleged as its commission, and from the usual protections which surround its trial.

On the other hand the special tribunal's judgment, rendered it may be on disputed facts as well as law, becomes binding against the accused, in the later proceeding. He cannot then dispute it, regardless of whether meanwhile the facts have changed [35] or new and additional evidence has been discovered and might be tendered with conclusive effect, if it were admissible. He can tender no evidence on what may be the most vital issue in his case and one, it may likewise be, that the evidence then available would sustain overwhelmingly. The trial court must shut its eyes to all such offers of proof and, moreover, to any such issue of law.

## VI.

A procedure so piecemeal, so chopped up, so disruptive of constitutional guaranties in relation to trials for crime, should not and, in my judgment, cannot be validated, as to such proceedings, under the Constitution. Even war does not suspend the protections which are inherently part and parcel of our criminal process. Such a dissection of the trial for crime could be supported, under our system, only upon some such notions as waiver and estoppel or res judicata, whether or not embodied in legislation.[36] These too are strange and inadequate vehicles for trying whether the citizen has been guilty of criminal conduct. They bar defense, while keeping prosecution open, before it begins.

---

[35] His only remedy is to begin a new protest proceeding (§ 203 (a)), which is not only as limited in character as the original one, but under the administrator's procedural regulations must be "filed within . . . sixty days after the protestant has had, or could reasonably have had, notice" of the changed facts. Revised Procedural Regulation 1, § 1300.26. Cf. notes 29, 30 *supra*.

[36] Cf. note 22 *supra*.

Res judicata, by virtue of a judgment in some prior civil proceeding, where different constitutional guaranties relating to the mode and course of trial have play, has not done duty heretofore to replace either proof of facts before a jury or decision of constitutional questions necessary to make up the sum of guilt in the criminal proceeding itself. Congress can invade the judicial function in criminal cases no more by compelling the court to dispense with proof, jury trial or other constitutionally required characteristics than it can by denying all effect of finality to judicial judgments. Cf. *Schneiderman* v. *United States*, 320 U. S. 118, concurring opinion at 167–168. And while, as noted above, notions of waiver and estoppel have had place in criminal proceedings to an extent not wholly defined, in some instances harshly and artificially,[37] they have not had effect heretofore to enable Congress to force a waiver of defense upon the individual by offering a choice between two kinds of trial, neither of which satisfies constitutional requirements for criminal trials. Certainly when the consequences are so novel and far reaching as they may be under this procedure, both for the individual and for the judicial system, these conceptions should not be given legal establishment to bring them into being.

To state the question often is to decide it. And it may do this by failure to reveal fully what is at stake. The question is not merely whether the protest proceeding is adequate in the constitutional sense for some of the purposes pertinent to that proceeding. It is rather what effect shall be given to the civil determination in the later and entirely different criminal trial. It is whether, by substituting that civil proceeding for decision of basic issues in the criminal trial itself, Congress can foreclose

---

[37] Compare *Johnson* v. *Zerbst*, 304 U. S. 458; *Glasser* v. *United States*, 315 U. S. 60; with *Patton* v. *United States*, 281 U. S. 276; *Adams* v. *United States ex rel. McCann*, 317 U. S. 269.

the accused from having them decided in that trial and thereby deprive him of the protections in trial guaranteed all persons charged with crime and thus of full and adequate defense. It is not the equivalent of that sort of defense to force one to initiate a curtailed civil suit or to cut him off shortly from all defense on the issues allocated to it, if he does not do so. Again, the question is not merely whether the individual can waive his constitutional trial of the issue of validity. It is rather whether Congress can force him to do so in the manner attempted and, beyond this, whether he and Congress together, in the combined effects of what they do, can so strip the criminal forum of its power and of its duty to abide the law of the land. And if the issue is further whether Congress can do this in some situations, respecting some issues, under more usual safeguards, the question requires attention to these important limitations.[38]

The procedural pattern is one which may be adapted to the trial of almost any crime. Once approved, it is bound to spawn progeny. If in one case Congress thus can withdraw from the criminal court the power to consider the validity of the regulations on which the charge is based, it can do so for other cases, unless limitations are pointed out clearly and specifically. And it can do so for statutes as well. In short the way will have been found to avoid, if not altogether the power of the courts to review legislation for consistency with the Constitution,[39] then in part at least their obligation to observe its commands and more especially the guaranteed protections of persons charged with crime in the trial of their causes. This is not merely control or definition of jurisdiction. It

---

[38] Cf. note 41 *infra.*

[39] Cf. McLaren, Can a Trial Court of the United States Be Completely Deprived of the Power to Determine Constitutional Questions? (1944) 30 A. B. A. J. 17.

is rather unwarranted abridgement of the judicial power in the criminal process, unless at the very least it is confined specifically to situations where the special proceeding provides a fair and equal substitute for full defense in the criminal trial or other adequate safeguard is afforded against punishment for violating an order which itself violates or may violate basic rights. So much should not be accomplished merely by giving to the failure to take advantage of opportunity for summary civil determination, coupled with a short statute of limitations upon its availability, the effect of a full and final criminal adjudication. To do this hardly observes the substance of "adequacy" in criminal trials.

From what has been said it seems clear that Congress cannot forbid the enforcing court, exercising the criminal jurisdiction, to consider the constitutional validity of an order invalid on its face. Any other view would permit Congress to compel the courts to enforce unconstitutional laws. Nor, in my opinion, can Congress forbid consideration of validity in all cases, if it can in any, where the invalidity appears only from proof of facts extrinsic to the regulation. Again the racial or religious line is obvious and pertinent. If, for instance, one charged criminally with violating the regulation should tender proof it was being enforced in a manner to deny him the equal protection of the laws, because of his racial or religious connections, it is difficult to believe the evidence could be excluded consistently with the judicial obligation. The Constitution does not make judicial observance or enforcement of its basic guaranties depend on whether their violation appears from the face of legislation or only from its application to proven facts. *Snowden* v. *Hughes,* 321 U. S. 1; *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373–374; *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–154.

For legislation not void on its face, a presumption of constitutionality attaches and remains until it is proven

invalid or so in operation. In such cases there is no unfairness, nor any invasion of the court's paramount obligation, in requiring one who would avoid the regulations' impact to show they are not what they appear to be or that they are made to operate otherwise than as they purport or were intended. But it is one thing to say that burden must be borne within the enforcement proceeding itself and another to say it must be carried entirely outside it. To require the defendant to prove invalidity in such a situation in the criminal trial itself, upon a showing of violation of the statute, is wholly permissible. But for the court to be unable to receive tendered evidence which might disclose the statute's invalid character and effect, is quite different. Certainly, under the circumstances of this case, it would seem to be as much a violation of individual right and as much an invasion of the judicial function for Congress to command the court not to receive the evidence, regardless of its character or effect, as for it to direct the court to enforce a law or an order void on its face.

## VII.

To sanction conviction of crime in a proceeding which does not accord the accused full protection for his rights under the Fifth and Sixth Amendments, and which entails a substantial legislative incursion on the constitutionally derived judicial power, if indeed this ever could be sustained, would require a showing of the greatest emergency coupled with an inability to accomplish the substantive ends sought in any other way. No one questions the seriousness of the emergency the Price Control Act was adopted to meet. And it has been urged with great earnestness that the nation's security in the present situation requires that the statute's procedure, followed in this case, be sustained to its full extent.

That argument would be more powerful if enforcement of the statute, and thus maintenance of price control, were

dependent upon accepting every feature. No doubt to impose the criminal sanction as has been done in this case implements the enforcement process with the deterrent effects which usually accompany that sanction. But neither its use nor enforcement of the statute's substantive prohibitions requires that the criminal court shall not consider the validity of the regulations.

With the arsenal of other valid legal weapons available, there can be no lack of speedy and effective measures to secure compliance. The regulations are effective until invalidated. They cannot be suspended by any court, pending final decision here, if the last source of relief is sought. All the armory of equity, and with it the sanctions of contempt, are available to keep the regulations in force and to prevent violations, at least until decision here is sought and had that the regulations are invalid. The same weapons are available to enforce them permanently if they are found valid. Apart from defense when charged with crime, the individual's only avenue of escape, and that not until final decision of invalidity has been made, is by protest and appeal through the single route prescribed. Finally, in addition to all this, the dealer may be punished for crime if he violates the regulation willfully and cannot show it is invalid either in his defense or by securing a judgment to this effect through the protest procedure. In either case, in view of the statute's curtailment of his substantive rights and the consequent increase in the burden of proving facts sufficient to nullify the regulation,[40] his chance for escape

---

[40] That burden is heavy, as this case illustrates. Petitioners attacked the regulation's constitutionality on the ground that, by compelling them to sell at prices less than cost, it deprived them of their property without due process of law. And, on the same ground, they urged the regulation violates the statute's requirement that the price fixed allow margins which are "generally fair and equitable." But the Fifth Amendment does not insure a profit to any given individual

becomes remote, to say the least. In view of all these resources and advantages, the assertion hardly is sustained that enforcement requires also depriving the accused of his opportunity for full and adequate defense in his criminal trial.

War requires much of the citizen. He surrenders rights for the time being to secure their more permanent establishment. Most men do so freely. According to our plan others must do so also, as far as the nation's safety requires. But the surrender is neither permanent nor total. The great liberties of speech and the press are curtailed but not denied. Religious freedom remains a

---

or group not under legal compulsion to render service, where doing so would contravene an enacted policy of Congress sustainable on a balance of public necessity and private hardship. Cf. the Court's opinion herein and authorities cited; also *Bowles* v. *Willingham, post,* p. 503. And in this case both the statute's basic purpose and its terms, as well as the legislative history, cf. Sen. Rep. No. 931, 77th Cong., 2d Sess., 15, show that Congress intended to forbid only a price so low that the trade in general, not merely some individual dealers or groups, could not have the margin prescribed. *Bowles* v. *Willingham, supra.* Petitioners' offers of proof, in this respect, which the trial court rejected, went only to show that they, or at most the meat wholesalers of Boston, could sell beef only at a loss. Harsh as this may seem in individual instances, it was Congress' judgment that the interests of dealers who could not operate profitably at a level of prices permitting a fair margin generally to the trade, would have to give way, in the acute prevailing circumstances, to the paramount national necessity of keeping prices stabilized; and that judgment, by virtue of those circumstances, was for Congress to make. Accordingly the tendered proof hardly was sufficient to raise an issue of confiscation giving ground for setting aside the regulation.

It is likely that by far the greater number of challenges would arise on grounds of supposed confiscation, in which this burden would have to be met. Once it is made clear just what that burden is, the fear hardly seems justified that enforcement would swamp the agency with litigation. In any event, the remedy for that would be by providing a more adequate enforcing staff, not by cutting off defense to criminal prosecutions based on invalid orders.

living thing. With these, in our system, rank the elemental protections thrown about the citizen charged with crime, more especially those forged on history's anvil in great crises. They secure fair play to the guilty and vindication for the innocent. By one means only may they be suspended, even when chaos threatens. Whatever else seeks to dispense with them or materially impair their integrity should fail. Not yet has the war brought extremity that demands or permits them to be put aside. Nor does maintaining price control require this. The effect, though not intended, of the provision which forbids a criminal court to "consider the validity" of the law on which the charge of crime is founded, in my opinion, would be greatly to impair these securities. Hence I cannot assent to that provision as valid.

Different considerations, in part at any rate, apply in civil proceedings.[41] But for the trial of crimes no proce-

---

[41] Cf. concurring opinion in *Bowles* v. *Willingham, post,* p. 503. Limitations applicable solely to criminal proceedings fall to one side. Giving the decision in the special proceeding, or failure to seek it after reasonable opportunity, the effect of res judicata in later civil proceedings does not therefore deprive the party affected of opportunity for full and adequate defense in his criminal trial, where not only his rights of property, but his liberty or his life may be at stake.

However widely the character of the special remedy may be varied to meet different urgencies, with consequences of foreclosure for civil effects, the foreclosure of criminal defense should be allowed, if at all, only by a procedure affording its substantial equivalent, in relation to special constitutional issues and in such a manner that the failure to follow it reasonably could be taken as an actual, not a forced waiver. Thus, possibly foreclosure of criminal defense could be sustained, when validity turns on complex economic questions, usually of confiscatory effects of legislation, and proof of complicated facts bearing on them. But, if so, this should be only when the special proceeding is clearly adequate, affording the usual rights to present evidence, cross-examine, and make argument, characteristic of judicial proceedings, so that, if followed, the party would have a sub-

dure should be approved which dispenses with trial of any material issue or splits the trial into disjointed segments, one of which is summary and civil, the other but a remnant of the ancient criminal proceeding.

The judgment should be reversed.

I am authorized to say that Mr. JUSTICE MURPHY joins in this opinion.

---

stantial equivalent to defense in a criminal trial. And the opportunity should be long enough so that the failure to take it reasonably could be taken to mean that the party intends, by not taking it, to waive the question actually and not by forced surrender. So safeguarded, the foreclosure of such questions in this way would not work a substantial deprivation of defense.

In respect to other questions, such as the drawing of racial or religious lines in orders or by their application, of a character determinable as well by the criminal as by the special tribunal, in my opinion the special constitutional limitations applicable to federal criminal trials, and .due enforcement of some substantive requirements as well, require keeping open and available the chance for full and complete defense in the criminal trial itself.