PORTER, Adm'r, OPA, v. GUY S. READ, Inc., and eighteen other cases.

Nos. 23396–23401, 23502–23504, 23506–23509, 23511–23513, 23537, 23538, 23677.

District Court, N. D. Ohio, Eastern Division.

June 27, 1946.

Walter J. Heddesheimer, of Cleveland, Ohio, for OPA.

H. P. Henley, of Barberton, Ohio, for defendants Newton Provision Co., Lee Amadio, and Walker Bros.

John B. Oviatt, of Cleveland, Ohio, for defendant Guy S. Read, Inc.

Clarence C. Fowerbaugh (of Bloomfield, Fowerbaugh & Mintz), all of Cleveland, Ohio, for defendant Long Dressed Beef Co.

C. A. Fisher (of Fisher, Limbach, Smith & Renner), all of New Philadelphia, Ohio, for defendant F. B. Maurer.

Black, McCuskey, Souers & Arbaugh, of Canton, Ohio, for defendant Canton Provision Co.

Samuel D. Ungar, of Youngstown, Ohio, for defendant Dizdar Packing Co.

H. A. Spring, H. K. Bell (of Spieth, Taggart, Spring & Annat), all of Cleveland, Ohio, for defendants Ohio Provision Co. and Reliable Packing Co.

David Lloyd Suid, of Cleveland, Ohio, for defendant Fleishman Beef Co.

H. A. Rocker and A. R. Fiorette, both of Cleveland, Ohio, for defendant Toth Packing Co.

A. R. Fiorette, of Cleveland, Ohio, for defendants Gerstenlager Bros., Blom & Co., Inc., and Sheller Bros.

John H. Watson, Jr., John T. Scott, and Robert W. Wheeler (of M. B. & H. H. Johnson), all of Cleveland, Ohio, for defendant Cleveland Provision Co.

Charles J. Smith and Francis R. O'Brien, both of Cleveland, Ohio, for defendant R. D. Graves Co.

John H. Ranz, of Youngstown, Ohio, for defendant Hygrade Food Products Co.

Zieger & Zieger, of Youngstown, Ohio, for defendant Lloyd Packing Co.

WILKIN, District Judge.

These nineteen cases were combined for presentation because they all raised the same questions, with slight variations in the facts. Two cases were tried, one against Guy S. Read, Inc., 23397, and the other against the Canton Provision Co., 23502, and it was agreed by counsel in all the other cases that the evidence adduced in the two cases should apply in the other cases. It was also stipulated that the defendants in the other cases should have permission to file affidavits setting forth any special facts deemed pertinent, and also should have leave to file briefs supplementary to the main briefs in the two principal cases tried. After all affidavits and briefs had been filed the court heard oral arguments.

In each of the actions the Price Administrator sought a permanent injunction to restrain the defendant from violating Maximum Price Regulation 574, which establishes ceiling prices on live bovine animals. The complaints allege that the defendants violated the regulation during certain monthly accounting periods by paying more than the maximum permissible cost, commonly referred to as the "drove ceiling" for cattle slaughtered during each of said accounting periods.

Under this regulation the defendants had to purchase each bovine animal at its live weight at time of sale, but the price allowed was determined by process of grading and the application of certain fixed-yield factors after the animal had been slaughtered and reduced to a chilled carcass. In other words, the defendants paid a price for each animal which it was estimated would not exceed maximum price figured on the dressed and graded meat. The defendants or their buyers looked at the animals in the stockyard and estimated what the grade of meat would be and how much meat would be available after the animals had been killed and dressed and after loss of weight

in shipment, and loss by exclusion of diseased animals.

There were three defenses to all the actions:

1. Regulation 574 is unconstitutional and void because compliance is impossible.

2. Impossibility of framing or stating an injunction to compel compliance with Regulation 574, since there is no way in which the defendant can know at the time he buys cattle whether or not the injunction is being violated.

3. Any violations shown in these cases were small in comparison to the amount of business done, and were unintentional. In other words, the defendants exercised diligence and good faith in endeavoring to comply with the regulation; and affirmed their intention of continuing to exercise diligence and good faith. The injunction therefore would serve no useful purpose.

 This court overrules the first two defenses. The court declines to hold that Regulation 574 is unconstitutional or void. It further holds that it is not impossible to frame an injunction to restrain wilful violations of such regulation. If this court entertained any serious doubts as to the insufficiency of the first two defenses, such doubts are dispelled by the decisions in the following cases:

Sec. 204(d), Emergency Price Control Act, 50 U.S.C.A.Appendix, § 924(d); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Shrier v. U. S., 6 Cir., 1945, 149 F.2d 606; Bowles v. Izakowitz, D.C.S.D.N.Y., 1945, 66 F.Supp. 156; Bowles v. Philip Fleischer, Inc., D.C.S.D.N.Y., 1945, 66 F.Supp. 362; Bowles v. Jones, D.C.W.D.Ky., 4 O.P.A. Op. & Dec. 2061; Bowles v. Truntz, D.C.E.D.N.Y., 1945, 66 F.Supp. 363.

Even if such decisions should not accord with the views of this court, nevertheless this court's respect for the principle of stare decisis, as well as its respect for the authorities cited, would impel compliance with such former rulings.

 After careful consideration of all the testimony, the arguments, and the briefs, the court is constrained to sustain the third defense. These cases fall within the principle announced and beautifully stated in the case of Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L. Ed. 754: "The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied. We do not think the history or language of Section 205(a) compel it."

The position of the Administrator was that any payment over and above the maximum permissible amount determined after slaughter and grading was a violation which entitled the plaintiff to an order of injunction. The defendants contended that it was impossible to comply absolutely with the regulations of the Office of Price Administration; that a substantial compliance was all that could be expected in view of the nature of Regulation 574. They insisted that the evidence revealed a very creditable performance and compliance and that there was no evidence of wilful negligence or intended violation of law.

The evidence of violations was found in the reports made by the defendants on Form DS—T—55. The defendants frankly admitted the excessive payments but offered various excuses and explanations, ranging from "tough" grading by a new grader, to miscalculation by OPA clerks, and including such other excuses as animals condemned, freight not allowed, a change of slaughter house with consequent effect on accounting period. Both the Administrator and the defendants offered evidence or made statements as to periods beyond the accounting periods set up in the complaints. While there have been violations in some cases since the filing of the actions, during most of the accounting periods there were no violations, and if the accounting period were extended they would cancel out, i. e.,

over a longer period the purchases below ceiling more than cancelled the purchases above ceiling. On the whole the evidence reveals that violations were the exception.

In all cases the parties and their counsel insisted that the defendants had employed experienced and competent buyers and had made a diligent effort to comply with the law. They asserted with great emphasis that it was their intention to comply with the law in the future, taking advantage of the experience of the past. The defendants who testified orally said emphatically that if they could not operate within the law they would go out of business. All the defendants are reputable dealers and worthy of confidence.

Counsel for the Administrator maintained not only that a technical violation, regardless of intent, entitled the Administrator to an order of injunction, but insisted that the order of injunction should issue even though the effect of the order would be to put all the defendants out of business.

■ This court recognizes and has had occasion in the past to commend the zeal with which the Administrator and his agents and attorneys have striven to enforce the law. It also recognizes, as stated in the Hecht case, that "the Administrator does not carry the sole burden of the war against inflation. The courts also have been entrusted with a share of that responsibility." But it must also be remembered that the "standards of public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases".

■■ This court cannot be unmindful of the general market conditions in this community and in the country. Newspapers have been reporting for several days that there is no meat in the retail market in Cleveland. Papers of the Northern District of Ohio have reported as news and editorially that 70% or more of the meat sold to consumers was furnished by "black market" operators. Reports of Congressional hearings confirm this condition generally. One of the evil effects of the law is that it imposes a severe burden on the reputable and regular operator and favors the illicit dealer. This evil effect should not be intensified by an extreme interpretation of the law or an extremely rigorous enforcement of it. Since exact performance is impracticable by legitimate dealers in competition with the "black market" operator, the Administrator and the courts should be satisfied with a showing of substantial compliance in good faith; in other words, legitimate dealers should not be penalized for casual and inadvertent violations. "Equity looks at the intention and regards the spirit, and not the letter".

It will not conserve the purpose of the law to force out of business these dealers who are in good faith trying to observe the law. If the law were rigorously enforced against "black market" operators, if the "black market" were suppressed, the efforts of legitimate dealers to comply with the law would be successful. If the statutes providing for price regulations really represent the public opinion of the country, then an adequate police force should be provided for their complete enforcement. To enact a statute and then fail to provide for its adequate administration is not just a nullity; it is much worse. It serves to corrupt trade generally by suppressing honest dealers and opening the way to ready gains by illicit traders. A price regulation inadequately policed actually defeats its own object. It tends to increase inflation.

■ One District Judge has felt compelled by the interpretation given to the law by the Circuit Court of Appeals of that Circuit, to issue an injunction in circumstances similar to the facts in these cases. He issued an injunction even though he knew at the time that non-wilful violations are bound to occur, expressly reserving, however, the question of their enforcibility, saying: "I am yet to be persuaded that an equity court can punish conduct that contains no ingredient of evil". This court feels, however, that no injunction should issue, if on proof of recurrence of the acts complained of, no finding of contempt could be made.

■ It seems best that injunctions should not issue in these cases at this time. The court will not dismiss the complaints, how-

ever, but will retain the cases on the docket with the right of the Administrator on notice to renew his application for injunctive relief if violations recur. The court hopes that the Administrator will be afforded sufficient appropriations and manpower to suppress "black market" operations. If that is done, it is not likely that there will be any further complaints against these defendants. If, however, violations by these defendants continue regardless of past experience and to the extent or under such circumstances that they indicate not mere inadvertence, but negligence or want of good faith, then the court will grant the relief prayed for. These defendants must continue their utmost efforts to comply with the law, while the Administrator should direct his efforts to the enforcement of the law against those who wilfully and secretly violate.