**S. Fred EVERETT, M.D., Appellant,**

v.

**FRANCISCAN SISTERS HEALTH-CARE, INC., a Minnesota non-profit corporation, Appellee.**

No. 88–5471MN, 88–5525MN.

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1989.

Decided Aug. 25, 1989.

---

James Williams, Minneapolis, Minn., for appellant.

John R. Kenefick, St. Paul, Minn., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and DUMBAULD,* Senior District Judge.

DUMBAULD, District Judge.

Appellant, S. Frederick Everett, M.D., a physician practicing in Fargo, N.D., and utilizing St. John's Hospital, located in that place, was without any pre-suspension hearing summarily suspended on July 18, 1988, from his hospital privileges by action of the Executive Committee of the medical staff of the hospital, pursuant to Article VII, section 2 of its by-laws. The decision was purportedly based upon a report prepared by an outside agency (Confidential Peer Review, Ltd.) and taken "in the best interest of patient care in the hospital." [1]

Appellant sought a restraining order and temporary injunction against appellee which were denied by the District Court [2] (App. 69–72, 134–146). Subsequently, after consideration of appellee's motion to dismiss or for summary judgment and lengthy affidavits submitted by both sides, the District Court dismissed appellant's action against appellee (App. 214–20). We affirm,

---

* The Honorable Edward Dumbauld, United States Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. Appendix of Consolidated Appeals (hereinafter cited as App.) 17. For the medical staff bylaws,

see Appellee's Supplemental Appendix of Consolidated Appeals (hereinafter cited as App. App.) 241.

2. The Honorable Donald D. Alsop, Chief Judge.

(but remand with permission to amend by adding the proper party as defendant).[3]

In view of our affirmance of the order of dismissal (discussed in II, *infra*) our discussion (in I, *infra*) regarding denial of temporary injunction, is largely an elaborate *obiter dictum,* and example of the rhetorical figure of *praeteritio.*[4] But it is included for the sake of chronological clarity and fuller understanding of the issues in the case.

## I

When Dr. Everett used both St. John's Hospital in Fargo, North Dakota and St. Ansgar's in Moorhead, Minnesota,[5] there was a complaint about him at St. Ansgar's. The record is not clear as to what disposition was made of that complaint. Appellant indicates that it came to naught and that he was vindicated, but voluntarily chose subsequently to confine his practice to St. John's. In any event, when for business reasons it was desired to combine the two hospitals, there were perhaps a half dozen members of the St. Ansgar's staff who resisted the merger because they did not wish to be numbered as colleagues and peers of Dr. Everett (App. 123–25, 203, 206).

From evidence in the record a trier of fact might have found that the business managers of the hospitals may have orchestrated proceedings against Dr. Everett for the promotion of peace and unity in the combined medical staff for the purpose of facilitating their business plans rather than for the professed purpose of protecting appellant's patients from inappropriate medical care and upholding the hospital's standards of professional care.

■ Article VII of the Medical Staff bylaws, pursuant to which appellant was summarily suspended, provides (App. App. 241–42, italics supplied):

Section 2: Procedure by Summary Suspension

(a) Any of the following groups (1) an officer of the medical staff plus an officer of the hospital, (2) *the Executive Committee of the medical staff,* or (3) the Governing Board, shall each have the authority, *whenever action must be taken immediately in the best interest of patient care in the hospital,* to summarily suspend all or any portion of the clinical privileges of a practitioner, and such summary suspension shall become effective immediately upon imposition. The officials causing the suspension shall give special notice within 24 hours to the affected practitioner detailing the reason for the action taken.

(b) A practitioner whose clinical privileges have been summarily suspended may within ten days after receipt of such notice request a hearing on the matter in accordance with Hearing and Appellate Review Procedure of these bylaws.

(c) Immediately upon the imposition of a summary suspension, the chairman of the Executive Committee or responsible chief of service shall have the authority to provide for alternative medical coverage for the patients of the suspended practitioner still in the hospital at the time of such suspension. The wishes of the patients shall be considered in the selection of such alternative practitioner.

The evidence to show that action against appellant had to be taken immediately in the best interest of patient care is rather scanty. None is mentioned in the letter of

---

**3.** The appeal in No. 88–5471MN, being the lower number, is from the denial of preliminary injunction: and the appeal in No. 88–5525MN is from the dismissal of the action against appellee (though this is not shown by the appeal papers submitted by counsel). The temporary restraining order decision is merged in the proceedings resulting in denial of a temporary injunction [appealable under 28 U.S.C. § 1292(a)(1)]. The order of dismissal, made after a motion by appellee for summary judgment and submission

of lengthy affidavits by both parties, is a final decision appealable under 28 U.S.C. § 1291.

**4.** Mentioning something while disclaiming intent to mention it (as when counsel refer to something not in the record).

**5.** The two hospitals are located about a mile from each other (App. App. 50)

July 18, 1988, communicating his suspension to Dr. Everett.[6] The report of Confidential Peer Review, Ltd. is there relied upon as the ground of suspension. That report (App. App. 54–186) reviewed 220 hospital records of Dr. Everett's patients, but none were later than 1987. There was no showing that any immediate danger was apprehended to any of Dr. Everett's patients who were in the hospital on July 18, 1988.

Our review of the report of Confidential Peer Review, Ltd. discloses only one death of a patient App. App. 98) and one reference to a patient admitted with a "life threatening disease" (lung cancer) who, the report states, should have received additional medication (App. App. 151).[7] Many of the charges of substandard care related to failure to take cultures or other diagnostic tests, or to medication in excess of the usual recommended amount (particularly monoamine oxidase inhibitors without prescribing tyramine free diet). Dr. Everett's response was that personal clinical familiarity with the tolerances and characteristics of patients over a long period of time permitted exercise of better medical judgment than reliance upon paperwork criteria (App. App. 29–31; App. 60–63).[8]

These circumstances do not demonstrate, however, that Judge Alsop erred in denying a preliminary injunction. *In limine* it must be remembered that the standard of appellate review is abuse of discretion. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981). The District Court carefully evaluated the factors to be considered in passing upon the propriety of interlocutory relief. 640 F.2d at 113.

As Judge Alsop judiciously observed (App. 142):

It is clear that the hospital's interests involve the interests of the public in general. In addition. St. John's has a particular interest in the patient care afforded to those admitted to its facility. It is the view of its medical staff that there exists a concern for proper patient care if preliminary injunction were to be granted. The court is not in a position to conclude otherwise. The hospital is legitimately concerned that Dr. Everett's suspension is in the best interests of patient care.

Neither is this Court in any position to conclude otherwise. Questions regarding medical treatment, the nature, amount, and manner of administration of medication, the cultures and other tests essential to proper diagnosis, and kindred matters, are not suitable for determination by juristic science. Appropriate deference to qualified medical judgment is required with respect to the substantive issues involved.

With respect to procedural due process, the hospital proceeded in accordance with reasonable regulations and in the light of legal advice. Its conclusions represent the result of painstaking consideration and the application of qualified medical judgment.

When Larry Narum, the chief administrator of both St. John's and St. Ansgar's, found that concern continued regarding the quality of appellant's practice, he consulted a Pittsburgh lawyer and was advised to retain an outside commercial investigating agency. This resort to uninvolved impartial medical authorities guaranteed discreet and circumspect inquiry (appellant was referred to only as "Physician # 6," and no publicity injurious to his economic interests or reputation would be generated).[9]

Counsel's advice not to notify Dr. Everett of the inquiry "since it was not required by the medical staff bylaws and would

6. See note 1, *supra*.

7. Moreover, there are no dramatic instances listed of specific actual harm to patients, such as the one in Pittsburgh a few years ago which was the subject of professional gossip, where a surgeon operating while befuddled by drink was said to have removed a patient's testicles rather than his tonsils.

8. In one instance, according to Dr. Everett, medication criticized as excessive had been prescribed *pro re nata* and in fact was never administered to the patient (App. 57–58). One criticism related to whether a particular medicine should be administered by bolus or by infusion (App. 38).

9. App. 123–25.

likely cause pressure to be exerted on the reviewing physicians" (App. 125) was likewise prudent. Dr. Everett is obviously a strongly self-confident polemicist. He presented a 60 page critique of the Confidential Peer Review, Inc. report (App. 138) and a cogent 6–page response (App. App. 41–48) to the report of the St. John's *ad hoc* investigative committee report (App. App. 24–33) as well as lengthy affidavits in the court case (App. 30–49, 50–68, 73–83).

The *ad hoc* committee's report carefully reviewed 43 records which had been identified in the Confidential Peer Review, Inc. report as demonstrating substandard care.[10] As to each case considered, the corresponding passage of Dr. Everett's 60–page response "was carefully considered on each case as it was reviewed" (App. App. 24). In approximately 9 (or perhaps 11) of these cases the committee found no substandard care (App. App. 25–28). In conclusion the committee found "that at least 15% of patient care records demonstrated substandard care" and recommended "that very decisive corrective action be taken by the Executive Committee, even to the extent of revocation of staff membership" (App. App. 31).

The 220 cases discussed in the Confidential Peer Review Ltd. report were considered by physician reviewers, but had been preliminarily identified by non-physician reviewers (App. App. 56). Appellant criticizes the use of non-physician reviewers (App. 11), but this practice appears no less defensible than the customary use of law clerks and paralegals by judges to sift or screen voluminous documents to locate pertinent material for consideration by the court. The final ratings in every instance

listed in the report were made by physicians.

■ It is thus apparent that appellant was afforded ample opportunity for hearing and suffered no denial of due process. Pre-suspension hearing is not required. *Yakus v. U.S.,* 321 U.S. 414, 436–37, 442, 64 S.Ct. 660, 672–73, 675, 88 L.Ed. 834 (1944). As Judge Alsop stated,

Case law supports summary suspension without hearing when adequate standards exist in the bylaws, those standards are met *and* a post suspension hearing is afforded. *See, e.g., Campbell v. St. Mary's Hospital,* 312 Minn. 379, 252 N.W.2d 581, [584] (1977) *see also, Ciatta [Citta] v. Delaware Valley Hospital,* 313 F.Supp. 301, [309–310] (E.D. Penn.1970).

Accordingly, we find no error or abuse of discretion in the District Court's denial of a preliminary injunction.

## II

■ Turning now to the dispositive issue in the case, it is obvious that St. John's Hospital, the Executive Committee of whose medical staff inflicted upon appellant the suspension of which he complained (App. 17), is a necessary defendant, and that no action injurious to appellant was taken by appellee, the parent holding company sued by appellant. Hence judgment of dismissal as to appellee must be affirmed.

Up to this point we have been speaking loosely of St. John's Hospital as the organization which granted clinical privileges to Dr. Everett, summarily suspended him therefrom,[11] and (if appellant were win to

---

10. App. App. 24. This committee was composed of Harold Evans, M.D. of Grand Forks, N.D., Ralph Dunnigan, M.D. of Bismarck, N.D., and Bruce Hetland, N.D. Proper consideration of local usages, practices, and standards was thus assured.

11. Besides the proceeding under Article VII, sec. 2 of the bylaws (which led to summary suspension of appellant), the chief administrator Larry Narum also instituted a complaint under Article VII, sec. 1, which led to complete and permanent revocation of appellant's hospital privileges. A 28(J) letter from John R. Kenefick,

counsel for appellee, dated June 9, 1989, informs the Court of the following additional facts:

A hearing was held in two sessions before a specially appointed Ad Hoc Medical Executive Committee. Dr. Everett and his counsel were present and participated fully. This committee consisted of three physicians who were not previously involved in the matter. The hearings were concluded in February and the panel issued its Findings and Recommendations on February 22, 1989. The three physicians made a recommendation to the Board

on the merits) would have to reinstate him or be liable for such other appropriate relief as might be awarded. This is legally speaking correct in a sense, but requires clarification to demonstrate precisely the corporate structure involved.

Before 1986, St. John's Hospital was an independent North Dakota non-profit corporation operated by the Sisters of St. Joseph of Carondelet. As of approximately January 1, 1986, it was sold to appellee Franciscan Sisters Health Care Corporation, a Minnesota non-profit corporation, which then owned a number of other health care institutions, including St. Ansgar's hospital, a Minnesota a non-profit corporation (App. 152, 172, 184–85 187–88, 190). On January 6, 1986, the articles of incorporation of St. John's Hospital, a North Dakota non-profit corporation, were amended or restated, and its name changed to Franciscan Properties, Inc. (App. 158–60). On April 19, 1988, St. Ansgar's Hospital (a Minnesota corporation) was authorized to do business in North Dakota under its own name (App. 161). Six days later, on April 25, 1988, it was registered and authorized to do business in North Dakota under the trade name "St. John's Hospital" (App. 162). On or before June 15, 1988, the process of gradually transferring the physical assets of the original St. John's Hospital from Franciscan Properties, Inc. (the new name for St. John's) to St. Ansgar's (operating under the facade or trade name of St. John's) began and is still continuing (App. 186).

As the result of these corporate maneuvers it will be seen that the "culprit" against whom Dr. Everett seeks relief, stated more technically the indispensable proper defendant, is St. Ansgar's, a Minnesota corporation authorized to do and doing business in North Dakota under the familiar name St. John's.

But it is plain that appellant has failed to sue St. Ansgar's (a Minnesota corporation lawfully doing business under the name St. John's in North Dakota). Instead he has sued St. Ansgar's "parent" corporation Franciscan Sisters Health Care, Inc.[12]

But it has long been well-settled law that where corporate formalities are strictly observed (as has been done in the case at bar [13]) a parent corporation and its subsidiary can not be treated as identical, or equivalent entities, for jurisdictional purposes. The acts of the one can not be regarded as the acts of the other. *Cannnon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925).

It is true that certain powers of supervision over St. Ansgar's/St. John's are reserved by the charter to the parent company, Franciscan Sisters Health Care, Inc. But these reserved powers relate exclusively to matters of finance and religious philosophy.[14] All questions relating to professional qualifications, clinical privileges,

---

of Directors of St. John's Hospital supporting the dismissal of Dr. Everett from the medical staff and the revocation of his admitting privileges.

The Findings and Recommendations of the Ad Hoc Medical Executive Committee were then sent to the Board of Directors of St. John's Hospital. The Board appointed a three-person subcommittee to review the file and transcript. Those three directors issued their own set of Findings and Recommendations dated March 28, 1989. The subcommittee concurred in the findings of the Ad Hoc Medical Executive Committee.

Finally, the Board of Directors of St. John's Hospital met on April 5, 1989 and concurred in the findings of the Ad Hoc Medical Executive Committee and the recommendations and findings of the three-person subcommittee.

By letter dated April 6, 1989, Dr. Everett was notified that the Board of Directors of St. John's Hospital officially revoked his admitting privileges and terminated his medical staff appointment.

12. It should be noted that the "parent" corporation is itself a totally owned subsidiary of Franciscan Sisters of Little Falls, Minnesota, a Minnesota non-profit corporation, which may be considered the "grandparent" corporation, in this three-tiered corporate structure (App. 213, 221).

13. No agency, alter ego, or piercing the corporate veil" affords occasion in the case at bar to depart from the settled rule of respecting the separate corporate identities of the entities involved.

14. App. App. 216–18, 222–25.

quality standards and discipline of the staff, fall within the sphere of authority vested in St. Ansgar's/St. John's, the operating subsidiary charged with day to day management of the hospital at Fargo, North Dakota, known to the local public as St. John's.[15]

█ The allegedly wrongful suspension of appellant which constitutes the foundation of his action in the case at bar [16] occurred in the normal course of business of the operating corporation St. Ansgar's/St. John's. If appellant is entitled to reinstatement or other remedy it must be accorded by the exertion of judicial power upon that corporation. Hence, the District Court's dismissal of Dr. Everett's pending action against appellee must therefore be affirmed. But since the proper and indispensable defendant *could* have been sued without defeating diversity jurisdiction (that defendant being a foreign corporation lawfully doing business in North Dakota but not a North Dakota *persona* or entity or citizen) justice would best be done by remanding the case to the District Court for the purpose of permitting amendment of the complaint by adding the proper party as defendant.[17] Accordingly, it is

SO ORDERED.

---

**15.** App. App. 226–28.

**16.** Appellant frames his pleading to allege breach of contract (violation of the medical staff by laws which formed part of his agreement with the hospital granting him staff privileges. Perhaps the familiar rhyme is applicable:
 Thoughts much too deep for tears pervade the Court When I assumpsit bring, and godlike, waive the tort.
[Quoted in *Gibson v. Gary Housing District*, 754 F.2d 205, 207 (7th Cir.1985)].

**17.** Besides adding the proper party as defendant, the amended complaint might also appropriately contain allegations challenging the permanent revocation of appellant's hospital privileges, as well as the emergency suspension without hearing. See note 11, *supra*.